# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| ASARCO LLC,<br><br>    Plaintiff,<br><br>    vs.<br><br>UNION PACIFIC RAILROAD COMPANY and UNION PACIFIC CORPORATION,<br><br>    Defendants. | Case No.: 2:12-cv-00283-EJL-REB<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**UNION PACIFIC RAILROAD COMPANY'S MOTION FOR PROTECTIVE ORDER (Docket No. 95)**<br><br>**UNION PACIFIC RAILROAD COMPANY'S MOTION FOR PROTECTIVE ORDER UNDER FRCP 26(b)(2)(C) AND 26(c)(1) (Docket No. 108)** |

Now pending before the Court are Defendant Union Pacific Railroad Company's (1) Motion for Protective Order (Docket No. 95), and (2) Motion for Protective Order Under FRCP 26(b)(2)(C) and 26(c)(1) (Docket No. 108). Having carefully considered the record and otherwise being fully advised, the undersigned enters the following Memorandum Decision and Order:

## I.  GENERAL BACKGROUND

The Ninth Circuit has already provided the background information which sets the stage for the instant action. *See Asarco, LLC v. Union Pacific R. Co.*, 765 F.3d 999 (9th Cir. 2014). It is included here:

> Asarco and Union Pacific both participated in nearly a century of mining operations in the Coeur d'Alene River watershed, a 1,500-square-mile area located in Idaho's northern panhandle. Asarco operated over 20 mines in the Coeur d'Alene site, and Union Pacific built rail lines and transported ore and other materials for the region's

**MEMORANDUM DECISION AND ORDER - 1**

mining and smelting facilities.  In 1983, the Environmental Protection Agency ("EPA") listed the Coeur d'Alene site on the CERCLA [(Comprehensive Environmental Response, Compensation, and Liability Act)] National Priorities List. Since then the site has undergone over 30 years of cleanup efforts by the EPA, the State of Idaho, and potentially responsible parties, including Asarco and Union Pacific.

In the 1990s, the United States, the State of Idaho, and the Coeur d'Alene Tribe each filed various claims against Asarco and other mining companies for response costs and natural resource damages at the Coeur d'Alene site.  These actions were consolidated in 2003 and, after a 78-day trial, Judge Lodge of the United States District Court for the District of Idaho issued an order apportioning liability based on the volume of mining waste released into the basin's waterways.  Asarco was found at least 22 percent responsible.

In 2005, before the damages portion of the consolidated case was concluded, Asarco filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.  Through bankruptcy, Asarco sought to resolve approximately $6.5 billion in environmental liabilities at 53 sites throughout the county.  Union Pacific and the United States both filed proofs of claim.

Union Pacific's proofs of claim sought a general unsecured claim for payment of freight charges and response costs at numerous sites, including $52 million in CERCLA response costs Union Pacific had paid at the Coeur d'Alene site.  In 2008, the parties entered into a settlement agreement (the "UP Settlement"), which resolved "all the claims by UP or claims which UP could have filed against ASARCO," and allowed Union Pacific a general unsecured claim of about $4 million.  Upon the parties' joint motion, the bankruptcy court approved the settlement.

The UP Settlement contains a "mutual release" provision, which states in relevant part:

> ASARCO agrees . . . to hereby release, remise, and discharge UP . . . from any and all damages, losses, expenses, costs, liabilities, claims, demands, suits, causes of action, and complaints, of any kind, character or description, in law or in equity, whether known or unknown*, arising out of or in any way connected with . . . Remaining Sites Costs*.

The UP Settlement defines "Remaining Sites Costs" to mean "costs of response under CERCLA *incurred by UP* at the Remaining Sites," including the Coeur d'Alene site.

**MEMORANDUM DECISION AND ORDER - 2**

The United States also filed proofs of claim in Asarco's bankruptcy case, asserting that Asarco was jointly and severally liable for more than $2 billion in cleanup costs at the Coeur d'Alene site. The bankruptcy court held a hearing to estimate the United States' claims against Asarco, but before the court ruled, Asarco and the United States executed an agreement settling the United States' Coeur d'Alene claims ("U.S. CDA Settlement").

The U.S. CDA Settlement resolved Asarco's liability for all remaining response costs and natural resource damages associated with the Coeur d'Alene site. Under the settlement, Asarco agreed that the United States would be entitled to general unsecured claims totaling about $482 million. For its part, the United States covenanted not to sue Asarco for further Asarco costs "[w]ith respect to the Coeur d'Alene Site." The bankruptcy court approved the proposed settlement on June 5, 2009.

On June 5, 2012, Asarco filed the underlying contribution action, seeking to recoup from Union Pacific a share of the $482 million it paid under the U.S. CDA Settlement. Asarco alleged that it had paid more than its allocable share of costs at the Coeur d'Alene site and demanded that Union Pacific pay "its equitable share of any overpayment of costs by Asarco." Asarco's original complaint defined the Coeur d'Alene site as "a 1,500-square mile area located in northern Idaho and eastern Washington," including "a 21-square mile area around [the Bunker Hill mining] complex" and the upper and lower basins of the Coeur d'Alene River. The original complaint provided that "[f]or purposes of this action, the Coeur d'Alene Basin . . . excludes the lower basins of the Coeur d'Alene River." Less than two months later, however, Asarco filed a First Amended Complaint ("FAC") as of right under Rule 15(a)(1), and amended the definition of "Coeur d'Alene Basin" to include the North Fork drainage area that was originally excluded.

Union Pacific filed a motion to dismiss Asarco's FAC under Rule 12(b)(6), arguing that Asarco's claim was barred by the statute of limitations, the UP Settlement, res judicata, judicial estoppel, Union Pacific's contribution protection, and Asarco's lack of any contribution rights. The district court rejected Union Pacific's statute of limitations arguments, but nevertheless granted the motion because it concluded that the action was barred by the UP Settlement's release provisions.

The district court acknowledged Asarco's argument that the defined term "Remaining Sites Costs" limited Asarco's release to claims for costs "incurred by UP," but reasoned that if it read the agreement as "limiting the releases to only Union Pacific's claims" the releases would then "be anything but mutual." The district court concluded that "[g]iven the scope of the definitions used in the FAC and the plain language of the [UP] Settlement, it is clear that the claim raised in the FAC is precluded by the mutual release language of the [UP] Settlement." The district court

**MEMORANDUM DECISION AND ORDER - 3**

therefore dismissed Asarco's action and declined to rule on Union Pacific's remaining defenses.

*Asarco*, 765 F.3d at 1002-03 (internal citations omitted) (emphasis in original).

Asarco appealed the district court's dismissal of its contribution action against Union Pacific.  On appeal, the Ninth Circuit reversed the district court, concluding that the UP Settlement Agreement[1] did not unambiguously release Asarco's claim.  *See id*. at 1010 ("We therefore conclude that the UP Settlement is ambiguous because it can be reasonably understood to release only claims involving Remaining Site Costs *incurred by Union Pacific*.  It was error for the district court to conclude otherwise.") (emphasis in original).

It is against this evolving factual backdrop that the two at-issue motions now present themselves.

The first motion – Union Pacific's Motion for Protective Order (Docket No. 95) – seeks to prohibit Asarco from taking the deposition of David P. Young, Union Pacific's current Assistant Vice President – Law (May 2014 - present), and former National Environmental Counsel (1999-2014) and General Solicitor for the Southern region (July 2005 - May 2014).  *See* Mem. in Supp. of Mot. for Prot. Order, p. 2 (Docket No. 96).[2]  According to Union Pacific, "Mr. Young served as lead in-house litigation counsel to Union Pacific during the course of the Asarco bankruptcy and continues to be actively engaged in the litigation, including development

---

[1]  Owing to other entities' references to the UP Settlement Agreement, this Memorandum Decision and Order also uses other terms for the same settlement agreement, including "Bankruptcy Settlement," "UPRR/Asarco Settlement Agreement," and "Bankruptcy Cost Settlement."

[2]  Union Pacific additionally seeks a protective order prohibiting Asarco from issuing further notices or subpoenas to any other counsel for Union Pacific.  *See* Mem. in Supp. of Mot. for Prot. Order, p. 2 (Docket No. 96).

**MEMORANDUM DECISION AND ORDER - 4**

and implementation of Union Pacific's litigation strategy regarding the case." *Id.*; *see also* Mot. for Prot. Order, p. 2 (Docket No. 95) ("Mr. Young has, at all times relevant to this case, served as in-house counsel supervising development and implementation of litigation strategies and the conduct of this case by Union Pacific with outside counsel.").[3]  In turn, Union Pacific objects to Mr. Young's deposition, arguing:

> Union Pacific objects to the proposed deposition on the basis that the requested discovery is unreasonably cumulative or duplicative, that it can be obtained from some other source that is more convenient, less burdensome, or less expensive, that Asarco has ample opportunity to obtain the information by discovery in the action through other less oppressive means, and that the burden of expense of the proposed discovery outweighs its likely benefit, considering the needs of the case and the importance of the discovery in resolving the issues.  Finally, the Ninth Circuit disfavors depositions of opposing counsel.  Asarco cannot demonstrate substantial need for deposing Mr. Young under any legal test.  In light of these infirmities, Asarco's attempt to take the deposition of Mr. Young is not reasonably calculated to lead to the discovery of admissible evidence and should be precluded.

*Id.* (internal citations excluded).

In response, Asarco points out that it is merely seeking information from the person who negotiated, approved, and signed the above-referenced UP Settlement Agreement – Mr. Young. *See* Opp. to Mot. for Prot. Order, pp. 1-2 (Docket No. 97) ("Union Pacific seeks to block this important fact discovery through its Motion for Protective Order, brandishing Young's title as in-house counsel, while failing to inform the court of his important, non-privileged communications across the bargaining table.  Young is a percipient witness to key events

---

[3]  At the same time, Union Pacific states that "Mr. Young has worked through outside litigation counsel and has had little direct interaction with the opposing party and has limited personal knowledge of relevant case facts."  Mem. in Supp. of Mot. for Prot. Order, p. 2 (Docket No. 96); *see also* Mot. for Prot. Order, p. 2 (Docket No. 95) ("However, Mr. Young has had little direct interaction with the opposing party and has limited personal knowledge of relevant case facts.").

**MEMORANDUM DECISION AND ORDER - 5**

regarding this Agreement, and the information sought by Asarco doses not pertain to any of his internal communications that may be privileged."). Moreover, Asarco claims that Mr. Young is the only percipient witness for Union Pacific who is not affiliated with any of the law firms now defending it in this action. *See id.* at p. 2. Therefore, according to Asarco, "[t]here are . . . *no other means* of obtaining evidence regarding Union Pacific's intention regarding the UP Settlement [Agreement], except through its only employee who participated in the negotiations, David P. Young." *Id.* (emphasis in original).

The second motion – Union Pacific's Motion for Protective Order Under FRCP 26(b)(2)(C) and 26(c)(1) (Docket No. 108) – seeks to draw a line around Asarco's discovery requests. *See* Mem. in Supp. of Mot. for Prot. Order, p. 2 (Docket No. 109) ("The Court should forbid Asarco's duplicative and unreasonably burdensome Discovery Requests and enter a protective order that Union Pacific need not respond to them."). Specifically, Union Pacific takes issue with (1) Asarco's Fourth Set of Interrogatories (claiming that Asarco has exceeded the permissible limit of interrogatories under the Federal Rules of Civil Procedure and Local Civil Rules, having submitted a "grand total" of 93 interrogatories); (2) Asarco's Fifth and Sixth Sets of Requests for Production of Documents (claiming that they are "duplicative, unreasonably cumulative, unduly burdensome, oppressive, create undue expense for Union Pacific, and the documents can be obtained by more convenient, less burdensome, and less expensive sources"); and (3) Asarco's Second Set of Requests for Admission (claiming that they are "unreasonably cumulative and unduly burdensome and the information requested can be obtained from other more convenient, less burdensome, and less expensive sources."). *Id.* at pp. 6-15.

In response, Asarco contends there is no basis whatsoever for the entry of a protective order, and that Union Pacific is the bad actor in moving for one in the first place. *See* Opp. to

**MEMORANDUM DECISION AND ORDER - 6**

Mot. for Prot. Order, p. 1 (Docket No. 118) ("Union Pacific has not shown that Asarco's requests are too broad or that they are not calculated to lead to the discovery of admissible evidence.  In fact, the written discovery requests Union Pacific hopes to avoid answering are very obviously crafted with precision; they are pointed directly to issues of paramount importance in this case.  Given the importance of the information being sought to the outcome of the case, it is no wonder that the Railroad would attempt this discovery maneuver.").

## II.  DISCUSSION

### A.    Union Pacific's Motion for Protective Order (Docket No. 95)

#### 1.    Legal Standard

Federal courts may issue protective orders in connection with discovery.  *See* Fed. R. Civ. `P. 26(c).  The court may, for good cause and after good faith attempts by the parties to resolve the dispute without court action, issue an order to protect a party or person.  *See id.*  Any such order, however, requires that the court "identify and discuss the factors it considered in its 'good cause' examination to allow appellate review of the exercise of its discretion."  *Phillips v. Gen. Motors*, 307 F.3d 1206, 1212 (9th Cir. 2002).  Generally, the party opposing discovery carries a "heavy burden" of showing why discovery should be denied.  *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975).

Relevant here, neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence prohibit taking the deposition of an opposing party's attorney.  Rule 30(a) permits a party to take the testimony of "any person, including a party" by deposition, without leave of court – setting forth certain exceptions to this provision, none of which exempts a party's attorney from being deposed.  Fed. R. Civ. P. 30(a); *see also NFA Corp. v. Riverview Narrow*

**MEMORANDUM DECISION AND ORDER - 7**

*Fabric, Inc.* 117 F.R.D. 83, 84 (D. N.C. 1987).  Still, perhaps reflecting the lack of any

prohibition in the Federal Rules against deposing adverse counsel, courts are split over the

appropriate standard to apply and whose burden it is to satisfy whatever standard that might be.

*See Townsend v. Imperial Co.*, 2014 WL 2090689, *1 (S.D. Cal. 2014) (discussing cases placing

burden on either party seeking protective order under FRCP 26(c), or party seeking to depose

another party's attorney by demonstrating propriety and need for deposition).

    A review of these cases – particularly those involving district courts within the Ninth

Circuit – identifies that the proper standard is that articulated in *Shelton v. America Motors

Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986).  *See, e.g.*, *Townsend*, 2014 WL 2090689 at *2

("Thus, whether or not Mr. Holbrook is "litigation counsel," in determining whether to grant a

protective order preventing his deposition, the Court will apply *Shelton's* three-prong test . . . .");

*Busey v. Richland Sch. Dist.*, 2014 WL 1404580, *2 (E.D. Wash. 2014) ("The Court next turns

to application of this test to Mr. Pettet, in-house counsel for the Richland School District.

Though *Shelton's* holding applies to "opposing trial counsel," district courts in this circuit have

applied the standard to depositions of in-house counsel as well.  Accordingly, the Court will also

examine the proposed deposition of Mr. Pettet in light of *Shelton*.").

    In *Shelton*, the Eighth Circuit acknowledged that the practice of forcing counsel (there,

trial counsel) to testify as a witness "has long been discouraged," and disrupts the adversarial

nature of our judicial system.  *Shelton*, 805 F.2d at 1327 (quoting *Hickman v. Taylor*, 329 U.S.

495, 513, 516 (1947)).  Even so, the court recognized some situations justified the taking of an

opposing counsel's deposition, but held that this should occur only in limited circumstances.  *See

Shelton*, 805 F.2d at 1327.  Specifically, the court held that a party should be permitted to take

**MEMORANDUM DECISION AND ORDER - 8**

the deposition of opposing counsel only where the party seeking to take the deposition has

shown that, (1) no other means exist to obtain the information than to depose opposing counsel;

(2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the

preparation of the case. *See id.* (citations omitted). The Court will apply these factors when

considering Union Pacific's Motion for Protective Order.

      2.      <u>Asarco Is Not Permitted to Depose Mr. Young at This Time</u>

In considering Union Pacific's earlier motion to dismiss, Judge Lodge framed this action

as follows:

> Asarco has now filed this case seeking to recover contribution costs from Union
> Pacific for the environmental damages it alleges Union Pacific's activities caused in
> the Coeur d'Alene Basin. Union Pacific counters that Asarco's contribution claim
> is barred by virtue of the settlement agreement entered into between these two parties
> in Asarco's bankruptcy proceeding. In response, Asarco asserts its contribution
> claim raised here were not released in any prior settlement agreement. . . . .
>
> Union Pacific's Motion to Dismiss field in this case argues, in part, that Asarco's
> contribution claim here is barred by the Bankruptcy Settlement. In response, Asarco
> argues it "is not precluded from bringing this action as a result of the Bankruptcy
> Case." Asarco maintains it did not release Union Pacific from its CERCLA
> contribution liability in the Bankruptcy Settlement. Union Pacific counters that the
> plain language of the Bankruptcy Settlement bars all of Asarco's claims.

*Asarco, LLC v. Union Pacific R. Co.*, 936 F. Supp. 2d 1197, 1202 (D. Idaho 2013) (internal

citations omitted). In short, this case (seeking contribution) turns upon the meaning and effect of

the mutual release language within the Bankruptcy Settlement/UP Settlement, a meaning which

is informed – as such things are – by the parties' respective intent in making such a settlement

Indeed, when considering Judge Lodge's dismissal of the action on appeal, the Ninth Circuit

recognized as much, commenting:

> Generally, "language will be deemed ambiguous when it is reasonably susceptible
> to more than one interpretation." Here, the release provision could plausibly mean,

**MEMORANDUM DECISION AND ORDER - 9**

as Union Pacific reads it, that Asarco's contribution claim against Union Pacific is released because the claim is broadly related to CERCLA response costs incurred by Union Pacific.  But this is not the only reasonable interpretation.  The release provision could also plausibly mean that Asarco's contribution claim against Union Pacific is reserved, not released, because the claim only relates to response costs incurred by Asarco.  After all, the limitation to costs incurred by Union Pacific could have easily been replaced with "incurred by UP or *Asarco*," had that been the parties' intent.  Because both parties' interpretations are reasonable, the mutual release provision is ambiguous.

*Asarco*, 765 F.3d at 1009 (internal citations omitted) (emphasis in original).  This is the prism for examining the arguments of the parties on this dispute and, when considered alongside *Shelton's* three factors, the Court concludes that Asarco should not be permitted to depose Mr. Young at this time.

> a.   *Shelton Factor No. 1: Other Means of Obtaining Information*

In correspondence between counsel on the issue of whether Mr. Young should be deposed, Asarco's counsel states:

> Asarco seeks to depose Mr. Young on non-privileged matters central to defendants' defenses. [Union Pacific] asserts that Plaintiff's claims against them are barred "because Asarco entered into a comprehensive settlement" with UPRR ("UPRR/Asarco Settlement Agreement") in the Asarco bankruptcy case that released all of the claims in the First Amended Complaint against UPRR and its shareholders, including UPC.  Mr. Young signed the UPRR/Asarco Settlement Agreement and participated in negotiations with Asarco, and Mr. Young appears to have been the primary UPRR official for the negotiation of the UPRR/Asarco Settlement Agreement.  Thus, Asarco seeks to depose Mr. Young as a fact witness regarding the UPRR/Asarco Settlement Agreement, among other things. . . . .
>
> In addition, Mr. Young has information on UPRR's communications with the Surface Transportation Board ("STB"), regarding UPRR's operations and activities in the Coeur D'Alene Basin.  Neither these communications with the STB nor UPRR's communications with Asarco regarding the UPRR/Asarco Settlement Agreement are privileged.

5/6/15 Ltr. from Brys to McIntosh, attached as Ex. G to McIntosh Decl. (Docket No. 95, Att. 7) (citing Union Pacific's Ans. to FAC, p. 28 (Docket No. 65)).  Union Pacific counters that "[b]oth

**MEMORANDUM DECISION AND ORDER - 10**

categories of information have already been provided and are otherwise obtainable through other means and through better sources than Mr. Young or other current Union Pacific counsel." Mem. in Supp. of Mot. for Prot. Order, p. 7 (Docket No. 96).  Further, Union Pacific says that (1) it has already produced nearly 500 pages of documents regarding Union Pacific's understanding of the settlement agreement's mutual release provision; (2) at least one other Union Pacific-related individual has knowledge about the settlement agreement, having "participated in the settlement negotiations on behalf of Union Pacific as its lead outside bankruptcy trial counsel"; and (3) Asarco itself participated in the settlement conversations and can speak to their content without Mr. Young testifying as much.  *See id*. at pp. 8-9.

     For the most part, these reasons are unconvincing.  That Union Pacific has produced a significant number of documents "concerning the subject matter" is immaterial without knowing whether, or to what extent, such documents speak to Union Pacific's intent leading up to, and ultimately when entering into, the UP Settlement Agreement – which is exactly how the Ninth Circuit has outlined the issue and, likewise, what Asarco seeks by way of Mr. Young's deposition.  Without more specifics as to these documents' ability to address *that* lynchpin issue, this argument misses the point.  Further, the fact that Asarco representatives also took part in the UP Settlement Agreement's negotiations, while noteworthy in the abstract, is not dispositive of the matter.  *Contra Busey*, 2014 WL 1404580 at *2 ("Defendant points out that while these communications may not be privileged, Plaintiff cannot establish that there is no other means of obtaining that information as required under *Shelton*, because Mr. Busey participated in the conversations and can therefore speak to their content.  The Court agrees with Defendant.").  Union Pacific presumably is not willing to concede that the Asarco representatives' account of

**MEMORANDUM DECISION AND ORDER - 11**

the negotiations is accurate (and Union Pacific has not suggested as much); accordingly, Asarco's involvement in the negotiations does not operate as a *de facto* bar to its subsequent attempt at discovering Union Pacific's view from the other side of the fence.

However, it is not immediately clear that Mr. Young is the only person with pertinent information on Union Pacific's position surrounding the UP Settlement Agreement's execution. Even if Mr. Young "served as the lead counsel for Union Pacific regarding Asarco's bankruptcy and subsequent contribution litigation matters" (5/1/15 Ltr. from McIntosh to Brys, attached as Ex. D to McIntosh Dec. (Docket No. 95, Att. 4)), that connection alone does not satisfy the *Shelton* test. Instead, Mr. Young must be the only practical resource for such information before he can be compelled to sit for his deposition. And, on this important point, Union Pacific identifies Robert W. Jones as the "go-to" person when it comes to Union Pacific's stance on the UP Settlement Agreement. *See* Mem. in Supp. of Mot. for Prot. Order, pp. 8-9 (Docket No. 96) ("Although Mr. Young attended one meeting with Asarco, which was also attended by several other Union Pacific representatives, and was involved in the internal Union Pacific approval process for the final Settlement Agreement terms, a review of the nearly 500-pages of documents produced by Union Pacific on this topic demonstrates that the lead negotiator and drafter for Union Pacific was Mr. Jones. If Asarco's own presence in the settlement discussions and the documentary evidence is somehow insufficient, there are other available witnesses with demonstrated knowledge greater than that of Mr. Young that Asarco has not attempted to depose."). Union Pacific's Initial Disclosures confirm as much:

> As former outside counsel for Union Pacific, Mr. Jones was lead bankruptcy counsel and negotiated the Settlement Agreement Between Asarco LLC and Union Pacific Railroad Company Regarding Past Environmental Response costs and Other Commercial Costs ("Bankruptcy Cost Settlement"), and is likely to have knowledge

**MEMORANDUM DECISION AND ORDER - 12**

concerning the parties' intent in drafting and entering the Bankruptcy Cost
Settlement.

Union Pacific's Initial Disclosures, attached as Ex. J to McIntosh Decl. (Docket No. 95, Att. 10);

*see also* Pfahl Decl., ¶ 3 (Docket No. 96) (Asarco's Corporate Land Manager testifying that,

"[t]o the best of [his] recollection . . ., only counsel, *including Robert Jones*, Carolyn McIntosh,

Norton Colvin and David P. Young, attended [the in-person settlement meeting/negotiations] on

behalf of Union Pacific.").  In short, the present record suggests that "other means exist to obtain

the information than to depose opposing counsel."  *See Shelton*, 805 F.2d at 1327.[4]  Mr. Young

does not appear to be the exclusive reservoir of the sought-after information.  Accordingly,

Asarco is not permitted to depose Mr. Young at this time.

        *b.*     *Shelton Factor No. 2: Information Sought is Relevant and Non-Privileged*

In its affirmative defense No. 14, Union Pacific alleges that "[Asarco's] claims against

Union Pacific are barred because Asarco entered into a comprehensive settlement with Union

Pacific and released all of the claims in the FAC in the Asarco bankruptcy case." Ans. to FAC, p.

28 (Docket No. 65).  This defense unquestionably makes the UP Settlement Agreement relevant

to the instant action, along with Union Pacific's intentions in making the UP Settlement

---

    [4]  The record is too underdeveloped concerning Mr. Young's alleged interactions with the
STB.  Certainly, Mr. Young communicated with the STB as a representative for Union Pacific,
but, without more, this is not enough to require that Mr. Young be deposed over somebody else
or, as Union Pacific argues, beyond what is already contained in the produced documents to date.
*See* Mem. in Supp. of Mot. for Prot. Order, p. 9 (Docket No. 96) ("Furthermore, Union Pacific
has produced over five hundred separate ICC/STB records to Asarco during the course of
discovery and Asarco has produced over one hundred separate ICC/STB records to Union
Pacific.  These records are public records, admissible under Fed. R. Evid. 902 and 1005, and
provide the means – indeed, superior means – for discovery Union Pacific's communications
with STB concerning CDA matters.") (citation omitted).  Simply put, Asarco must describe more
comprehensively its need for such material and how only Mr. Young's testimony (limited as it
may be given his actual time with Union Pacific) can best supply that information.

**MEMORANDUM DECISION AND ORDER - 13**

Agreement (as confirmed by the Ninth Circuit (*see supra*)).  Union Pacific agrees, as reflected by the following correspondence between counsel:

> Addressing the second and third *Shelton* factors, Union Pacific agrees that information regarding the Union Pacific/Asarco Settlement Agreement is relevant, that certain information regarding that agreement and the parties' intent in entering into that agreement is non-privileged, and that the information is important to the preparation of the case.

5/8/15 Ltr. from McIntosh to Brys, attached as Ex. I to Brys Decl. (Docket No. 99, Att. 9).

But, as relevant as this information may be, the contours of any legitimate claim of privilege and/or work product protection are not readily apparent at this time, given Mr. Young's position within Union Pacific's legal department.  Certainly, Mr. Young is a fact witness, having executed the UP Settlement Agreement on behalf of the company.  Hence, there are areas of inquiry that seemingly would not properly invoke claims of privilege or work product protection. At the same time, the avenue of such inquiry remains uncertain on this record, owing to the simple realities of the situation, and therefore the other considerations described in this decision hold sway.  *See e.g.*, *id.* (Union Pacific noting that, "given Mr. Young's role in the context of the negotiations was as lead in-house trial counsel, coordinating the litigation and strategy regarding the Asarco bankruptcy litigation, his participation and communications by him to outside counsel and to his client, Union Pacific, are all privileged or work product protected.").  To be clear, it may be that Mr. Young can properly be deposed on limited subjects directly linked to his business role as opposed to his lawyer's role.  However, the scope of what that subject matter may be is unknown at this time and does not need to be addressed within this Memorandum Decision and Order.  *See, e.g.*, *Melaleuca, Inc. v. Bartholomew*, 2012 WL 3544738, *1 (D. Idaho

**MEMORANDUM DECISION AND ORDER - 14**

2012) (recognizing that "blanket assertions of privilege are extremely disfavored," but acknowledging that "[t]he strong presumption against a blanket assertion of privilege, while normally appropriate and necessary, must be abandoned where a party seeks to depose trial counsel.").[5]

      c.     *Shelton Factor No. 3: Information is Crucial to the Preparation of the Case*

As stated above, Union Pacific's intent when it entered into the UP Settlement Agreement is absolutely relevant to this action.  Because the case turns in part upon this issue (actually, both Union Pacific's and Asarco's intent), such information is crucial to Asarco's claims against Union Pacific.  Yet, where the information that might be contained in Mr. Young's non-privileged testimony is available through others (or, at the very least, appears to be available to others based upon the current record), the Court is not persuaded that his specific testimony is crucial to Asarco's case.[6]

With all this in mind, after considering the *Shelton* factors, Asarco is not permitted to depose Mr. Young at this time and Union Pacific's Motion for Protective Order is granted.  However, the undersigned will not require Asarco to seek leave of court before attempting to take Mr. Young's or other Union Pacific counsel's deposition; in this respect, Union Pacific's

---

[5] This rationale also applies to Asarco's interest in deposing Mr. Young on STB-related matters, assuming his familiarity with such matters.  *See supra*; *see also* 5/8/15 Ltr. from McIntosh to Brys, attached as Ex. I to Brys Decl. (Docket No. 99, Att. 9) ("The second topic identified by Asarco, communications with the STB, is relevant and is part of the factual underpinning of the case.  But Mr. Young has no information about those communications.  Moreover, since the STB is a federal agency, all material communications with the agency are public records and do not require testimony from Union Pacific's long-time lead in-house counsel on Asarco litigation matters.").

[6] This rationale also applies to Asarco's interest in deposing Mr. Young on STB-related matters, assuming his familiarity with such matters.  *See supra*

**MEMORANDUM DECISION AND ORDER - 15**

Motion for Protective Order is denied.  Some of the lines raised by the pending motions are not yet fixed, and it would be inappropriate to draw such lines indirectly by way of such a protective order when the Court cannot presently draw them on the current record.

**B.      Union Pacific's Motion for Protective Order Under FRCP 26(b)(2)(C) and 26(c)(1) (Docket No. 108)**

   1.      Legal Standard

The Federal Rules of Civil Procedure and decisions of the Ninth Circuit favor discovery to assist in the underlying goals of litigation.  As such, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense" and this "[r]elevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  The Ninth Circuit has explained that it favors a broad scope of discovery.  "[W]ide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for truth."  *Epstein v. MCA, Inc.*, 54 F.3d 1422, 1423 (9th Cir. 1995); *see also Dysthe v. Basic Research, L.L.C.*, 273 F.R.D. 625, 628 (C.D. Cal. 2011).

Nonetheless, the right to access information is not absolute and courts will limit the frequency or extent of discovery otherwise allowed if: "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the

**MEMORANDUM DECISION AND ORDER - 16**

importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(i-iii).[7] "The

party opposing disclosure has the burden of proving 'good cause,' which requires a showing

'that specific prejudice or harm will result' if the protective order is not granted." *In re Catholic*

*Archbishop of Portland Oregon*, 661 F.3d 417, 424 (9th Cir. 2011) (quoting *Foltz v. State Farm*

*Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003)).

      2.      <u>Good Cause Does Not Exist to Issue a Protective Order</u>

            *a.*      *Asarco's Fourth Set of Interrogatories*

Each party may serve 25 interrogatories – more if stipulated to or ordered by the court.

*See* Fed. R. Civ. P. 33(a)(1); *see also* Dist. Idaho Loc. Civ. R. 33.1.  Union Pacific generally

submits that, while Asarco's four sets of interrogatories contain 22 interrogatories, they actually

represent upwards of 93 interrogatories when including the interrogatories' subparts.  *See* Mem.

in Supp. of Mot. for Prot. Order, pp. 6-7 (Docket No. 109).[8]

The undersigned has separately reviewed each of Asarco's 22 interrogatories and

concludes that, while several of them contain subparts, these subparts are "logically or factually

subsumed within and necessarily related to the primary question" so as to amount to a single

---

   [7]  Effective December 1, 2015, FRCP 26(b) was amended.  Because Union Pacific's
Motion for Protective Order Under FRCP 26(b)(2)(C) and 26(c)(1) was filed before any such
amendments took effect, the then-existing FRCP 26(b) is considered here.

   [8]  By this, the undersigned notes that Union Pacific simply claims that Asarco's
interrogatories, including subparts, exceeds the number of interrogatories permitted under the
applicable rules – Union Pacific does not actually identify within its opening briefing how it
arrived upon the alleged 93 interrogatories.  *But see, e.g.*, 5/6/15 Ltr. From McIntosh to Brys,
attached as Ex. D to McIntosh Decl. (Docket No. 110, Att. 4) (letter between counsel stating, in
part:  "In Asarco's first set of interrogatories to Union Pacific, Asarco propounded three (3)
interrogatories.  In the second set, Asarco propounded at least 32 interrogatories and discrete
subparts.  Interrogatory No. 7 alone includes nine (9) interrogatories and discrete subparts.  By
responding to Interrogatories Nos. 4 through 6 and 8, Union Pacific responded to the Rule 33
limit of twenty-five (25) interrogatories, avoided objection based upon Asarco's exceedance of
the limits, and responded to all interrogatories directed to it.").

**MEMORANDUM DECISION AND ORDER - 17**

interrogatory.  *Safeco of America v. Rawstron*, 181 F.R.D. 441, 445 (C.D. Cal. 1998) (internal

quotation marks and citations omitted); *see also Paananen v. Cellco P'ship*, 2009 WL 3327227,

*2 (W.D. Wash. 2009) ("Subparts relating to a 'common theme' should generally be considered

a single interrogatory.") (citation omitted).  For example, Asarco's Interrogatory No. 7

(discussed *supra*), makes the following request:

> Please identify every Person with information related to Asarco's claim that Union
> Pacific Corporation currently Owns or Operates, or formerly Owned or Operated, a
> Facility from which there was a permitted or unpermitted Release or threatened
> permitted or unpermitted Release of Hazardous Substances in the Coeur d'Alene
> Basin.  For each Person identified, please include his/her name, the subject of
> discoverable information possessed by that Person, his/her current address, telephone
> number, title, employer, supervisor, and supervisor's title, or if such current
> information is unknown the last known address, telephone number, title, employer,
> supervisor, and supervisor's title.

Asarco's Second Set of Interrogs., attached as Ex. B to McIntosh Decl. (Docket No. 110, Att. 2).

Interrogatory No. 7's subparts are methods of identifying an individual – exactly what Asarco

seeks to obtain by way of Interrogatory No. 7.  *See, e.g.*, *Becker v. Wells Fargo Bank, NA, Inc.*,

2013 WL 5406894, *4 (E.D. Cal. 2013) ("[T]he subparts to Interrogatory No. 1 are logically or

factually subsumed within and necessarily related to the primary question – namely, the identity

of percipient witnesses currently or previously employed by defendant – and therefore only

count as one interrogatory.").  As such, it should be treated as one interrogatory, not nine as

Union Pacific suggests.  *See supra*.  Further, Union Pacific provides no compelling argument as

to why each of Asarco's other interrogatories (contained within its four sets of interrogatories)

should not be similarly handled and resolved.  A protective order premised upon an excessive

number of interrogatories is therefore unwarranted.[9]

---

[9] Union Pacific notes that, "even if the additional interrogatories were valid, Union
Pacific has adequately responded pursuant to Fed. R. Civ. P. 33(d) through its extensive and full
production of responsive documents."  Mem. in Supp. of Mot. for Prot. Order, p. 3, n.1 (Docket

**MEMORANDUM DECISION AND ORDER - 18**

b.       *Asarco's Fifth and Sixth Sets of Requests for Production of Documents*

Union Pacific next complains that Asarco's Fifth and Sixth Sets of Requests For

Production of Documents are largely comprised of already-propounded requests, suggesting that

having to respond to them represents an impermissible burden under the Rules.  *See* Mem. in

Supp. of Mot. for Prot. Order, pp. 8-12 (Docket No. 109).  Specifically, Union Pacific points to

Request for Production Nos. 90-92, 94-96, 108, 110-113, and 118 as examples of cumulative

and/or duplicative requests.  *See id.*

Largely, the Court agrees.[10]  However, recognizing that there is no specified limit to the

number of requests for production of documents, the solution is not to strike *all* the requests

contained within Asarco's Fifth and Sixth Sets of Requests for Production of Documents.  That

is, though some of the requests contained therein may have already been responded to (*see*

*supra*), there are presumably others that are legitimately propounded upon Union Pacific.[11]  As

to such latter requests, Union Pacific should respond to them as required under the applicable

_____

No. 109).  The Court points out that, pursuant to FRCP 33(d)(1), a party may rely upon produced
business records in response to an interrogatory so long as it "specif[ies] the records that must be
reviewed, in sufficient detail to enable the interrogating party to locate and identify them as
readily as the responding party could . . . ."  Fed. R. Civ. P. 33(d)(1).  Whether this actually
happened is unknown and not discussed within this Memorandum Decision and Order.

[10]  This is to say that the Court agrees that certain of Asarco's requests appear to ask for
documents already requested.  This Memorandum Decision and Order does not address any
argument that Union Pacific has not actually produced certain requested documents and/or the
legal merits of allegedly not doing so.  *See, e.g.*, Opp. to Mot. for Prot. Order, pp. 11-12 (Docket
No. 118) (Asarco disputing Union Pacific's contention that it has produced requested consent
decrees and draft settlement agreements).

[11]  The Court declines Union Pacific's invitation to compare the rest of the requests
contained within Asarco's Fifth and Sixth Sets of Requests for Production of Documents with
Asarco's previous four sets.  *See* Mem. in Supp. of Mot. for Prot. Order, p. 12 (Docket No. 109)
("There are many other similar deficiencies and duplicates in *all of* Asarco's most recent
production requests.  (*Compare* Exs. H through M).").

**MEMORANDUM DECISION AND ORDER - 19**

Rules.  As to any requests that Union Pacific believes in good faith ask for documents already produced in response to earlier requests, Union Pacific can answer as much (with the requisite particularity)  – just as it has done by way of its briefing on the issue.[12]  To the extent Asarco disagrees and wants to then test any such response by way of a motion to compel, they are not precluded from doing so.  In short, no protective order is warranted.

        *c.*      *Asarco's Second Set of Requests for Admission*

FRCP 36(a)(1) provides:

> A party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to:

> > (A)    facts, the application of law to fact, or opinions about either; and

> > (B)    the genuineness of any described documents.

Fed. R. Civ. P. 36(a)(1)(A-B).  Unlike interrogatories, document production requests, and depositions, requests for admission "are not a discovery device at all, 'since [they] presuppose[ ] that the party proceeding under [FRCP 36] knows the facts or has the document and merely wishes its opponent to concede their genuineness.'" *Pasternak v. Dow Kim*, 2011 WL 4552389, *5 (S.D.N.Y. 2011) (quoting 8B Wright, Miller, & Marcus, Federal Practice and Procedure § 2253 at 324); *see also Safeco*, 181 F.R.D. at 445 ("Requests for admissions are not principally discovery devices . . . and they are not to be treated as substitutes for discovery processes to uncover evidence . . . .") (internal citation and quotation marks omitted).  Instead, the purpose of requests for admission is to narrow the issues for trial by identifying and eliminating those

---

[12]  In other words, much of the effort in comparing Asarco's various requests appears to have already been done in preparing and drafting up the instant Motion for Protective Order Under FRCP 26(b)(2)(C) and 26(c)(1).

**MEMORANDUM DECISION AND ORDER - 20**

matters on which the parties agree.  *See Safeco*, 181 F.R.D. at 443; *see also Asea, Inc. v. Southern Pacific Transp. Co.*, 669 F.2d 1242, 1245 (9th Cir. 1981) ("The purpose of Rule 36(a) is to expedite trial by establishing certain material facts as true and thus narrowing the range of issues for trial."); Fed. R. Civ. P. 36 Advisory Committee Notes (1970 Amendment) ("Rule 36 serves two vital purposes, both of which are designed to reduce trial time.  Admissions are sought, first to facilitate proof with respect to issues that cannot be eliminated from the case, and secondly, to narrow the issue by eliminating those that can be."); *Berry v. Federated Mut. Ins. Co.*, 110 F.R.D. 441, 443 (N.D. Ind. 1986) (Rule 36 is appropriate tool for establishing before trial genuineness and authenticity of anticipated exhibits).

Where requests for admission do not narrow the range of issues for trial but are "'unreasonably cumulative' and 'duplicative' of other discovery taken in the case, the requests do not serve the purpose of Rule 36(a)" and are properly subject to objection.  *Caruso v. Coleman Co.*, 1995 WL 347003, *2 (E.D. Pa. 1995).  For example, "[a] request for admission as to whether or not a particular witness testified to certain information at a deposition is duplicative of the deposition itself" and may properly be objected to on that ground.  *Id.*; *see also Van Wagenen v. Consolidated Rail Corp.*, 170 F.R.D. 86, 87 (N.D.N.Y. 1997) (requests for admission that "simply restate sentences" from a previously authenticated document are "unreasonably duplicative and cumulative"); *Workman v. Chinchinian*, 807 F. Supp. 634, 648 (E.D. Wash. 1992) (finding requests for admission asking party to admit that letter contained certain statements improper where party had already admitted the authenticity of letter and "only purpose served by the admission would be to bolster the effect of the letter in attacking [the letter writer's] credibility"); *Rios v. Tilton*, 2010 WL 3784703, *7 (E.D. Cal. 2010) (finding requests

**MEMORANDUM DECISION AND ORDER - 21**

for admission asking party to admit "authenticity of quoted portions" of California Code and

Department Operations Manual "impermissible in scope and unduly burdensome").  In addition,

"requests for admission should not be used to establish facts which are obviously in dispute, to

demand that the other party admit the truth of a legal conclusion, even if the conclusion is

attached to operative facts, or to ask the party to admit facts of which he or she has no special

knowledge." *Tuvalu v. Woodford*, 2006 WL 3201096, \*7 (E.D. Cal. 2006) (internal quotation

marks and citations omitted).

   Here, Union Pacific calculates that Asarco has made 328 requests for admission (151 in

Asarco's First Set of Requests for Admission, and 177 in Asarco's Second Set), "many of which

are duplicative or not directly aimed at limiting the issues for trial in this case."  Mem. in Supp.

of Mot. for Prot. Order, p. 14 (Docket No. 109).[13]  Union Pacific answered Asarco's First Set of

Requests for Admissions, while also objecting that the "requests for admission are duplicative of

other discovery regarding precisely the same issues, address geographic areas outside of the

scope of this litigation, or related to issues for which Asarco's claims are clearly barred."  *Id*.

(quoting Union Pacific's Resps. to Asarco's First Set of RFAs, attached as Ex. S to McIntosh

Decl. (Docket No. 110, Att. 19)).  Now, as support for its current request for a protective order as

to Asarco's Second Set of Requests for Admission, Union Pacific argues:

> Asarco has never responded to Union Pacific's objections.  But it now serves almost
> 200 further requests for admission, and it does so just one month prior to the
> discovery deadline and in the midst of 20 depositions.  The timing of these requests
> is important because all of the information Asarco seeks could be readily sought in

---

[13]  Union Pacific responded to Asarco's First Set of Requests for Admission; it has not
responded to Asarco's Second Set of Requests for Admission, thus prompting this portion of
Union Pacific's Motion for Protective Order Under FRCP 26(b)(2)(C) and 26(c)(1).  *See* Mem.
in Supp. of Mot. for Prot. Order, p. 14 (Docket No. 109).

**MEMORANDUM DECISION AND ORDER - 22**

the numerous depositions Asarco is taking during July and August 2015.  Not only can Asarco ask the specific questions it propounds in its additional requests for admission, but it can then also ask follow up questions and gather all information needed regarding these subject areas – on the record.  Importantly, it can do so without creating additional undue expense.  Therefore, at this state of the proceedings, depositions are clearly the superior method of discovery because they are more convenient, less burdensome, and less expensive, and still allow Asarco to gather all of the requested information.  Requiring Union Pacific to answer the written requests for admission would merely create duplicative, unreasonably cumulative, and unnecessary work and expense for Union Pacific.

*Id*. at pp. 14-15.

Hundreds of requests for admission almost raise a presumption of burdensome discovery, but the Court must consider them in the context of the case itself.  Some cases are more complicated than others, and certainly this case has many moving parts with significant financial stakes involved.  *See generally* Opp. to Mot. for Prot. Order, pp. 8-10 (Docket No. 118).  The Court's review of Asarco's Second Set of Requests for Admission reveal that they are fashioned in an attempt to systematically establish material facts informing (perhaps, even, narrowing) relevant issues surrounding claims and defenses.  This is entirely proper.  As to Union Pacific's point about the possibility for depositions to more easily speak to the matters raised within the requests for admission, given the August 31, 2015 discovery deadline, there is no indication in the record that this is *actually* the case (even when assuming the appropriateness of having such things resolved via deposition instead of requests for admission).  *See* Scheduling Order, p. 2 (Docket No. 83).  If, indeed, the requests for admission contained within Asarco's Second Set of Requests for Admission can be answered by resorting to deposition transcripts already in existence, Union Pacific is free to move for a protective order on that basis.  Until then, no protective order is warranted.

**MEMORANDUM DECISION AND ORDER - 23**

## III.  <u>ORDER</u>

Based on the foregoing, IT IS HEREBY ORDERED that:

1.      Union Pacific Railroad Company's Motion for Protective Order (Docket No. 95) is GRANTED, in part, and DENIED, in part, as follows:

a.      Asarco is not permitted to depose Mr. Young at this time; in this respect, Union Pacific's Motion for Protective Order (Docket No. 95) is GRANTED;

b.      The undersigned will not require Asarco to seek leave of court before attempting to take Mr. Young's or other Union Pacific counsel's deposition; in this respect, Union Pacific's Motion for Protective Order is DENIED.

2.      Motion for Protective Order Under FRCP 26(b)(2)(C) and 26(c)(1) (Docket No. 108) is DENIED.

DATED:  **May 2, 2016**

Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 24**