UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

ASARCO, LLC,

              Plaintiff,

      v.

UNION PACIFIC RAILROAD
COMPANY and UNION PACIFIC
CORPORATION,

              Defendants.

Case No. 2:12-CV-00283-EJL-REB

**MEMORANDUM DECISION AND
ORDER**

## INTRODUCTION

Before the Court in the above entitled matter are the parties' Cross-Motions for Summary Judgment and related filings. Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the Motions are decided on the record without oral argument.

## FACTUAL AND PROCEDURAL BACKGROUND

**1.    Underlying Proceedings**

Plaintiff in this case, Asarco LLC, was the subject of two prior lawsuits brought against it, and other defendants, under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq*., seeking remediation for damages caused by historical mining activities in northern Idaho. The first

MEMORANDUM DECISION AND ORDER - 1

case, *Coeur d'Alene Tribe v. Asarco Inc., et al.*, Case No. 3:91-cv-00342-EJL ("*CDA Tribe v. Asarco*"), was brought in 1991 by the Coeur d'Alene Tribe ("CDA Tribe") to recover natural resource damages ("NRD") caused by the release of mine tailings and other hazardous substances in the Coeur d'Alene River Basin ("CDA Basin"). (Dkt. 24 at ¶ 30.)[1] The second action, *United States, et al. v. Asarco Inc., et al.*, Case No. 3:96-cv-00122-EJL ("*United States v. Asarco*"), was filed in 1996 by the United States for recovery of response costs and NRD in connection with the Bunker Hill Mining and Metallurgical Complex Superfund Site. (Dkt. 24 at ¶ 31.) The cases were consolidated and, in 2003, this Court issued an Order finding Asarco responsible for contributing twenty-two percent of the mining tailings containing hazardous substances in the CDA Basin.[2] *See CDA Tribe v. Asarco Inc.*, 280 F.Supp.2d 1094, 1105 (D. Idaho 2003).

Thereafter, on August 9, 2005, Asarco filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. *See In re Asarco LLC, et al.*, Bankr. No. 05-21207, 2009 WL 8176641, at *2 (S.D. Tex. June 5, 2009). Through the bankruptcy proceeding, Asarco sought to resolve approximately $6.5 billion in environmental

---

[1] The term "CDA" will be used throughout this Order to refer to Coeur d'Alene.

[2] In the First Amended Complaint ("FAC") in this case, Asarco defines the CDA Basin as encompassing the watershed of the CDA River and Lake CDA; to include the watersheds of the North Fork and South Fork of the CDA River, the main stem of the CDA River and its floodplain, including the lateral lakes and associated wetlands, and Lake CDA. (Dkt. 24 at ¶ 22) (Dkt. 150-1 at 2 n. 2.) As used in the prior consolidated cases, "the Basin" referred to the CDA Basin but did not include the North Fork of the CDA River. *See CDA Tribe v. Asarco*, 280 F.Supp.2d at 1105. The parties here dispute the definition of the area encompassed in the definition of the CDA Basin and the use of the term "CDA Watershed."

MEMORANDUM DECISION AND ORDER - 2

liabilities at 53 sites throughout the country – including the CDA Site. The United States and the Defendants in this action, Union Pacific Railroad Company and Union Pacific Corporation (collectively "Union Pacific"), among numerous other claimants, filed proofs of claim ("POC") in the bankruptcy case. Union Pacific's POCs sought a general and unsecured claim for payment of freight charges and response costs at numerous sites, including $52 million in CERCLA response costs Union Pacific had paid at the CDA Site ("the Site" or "CDA Site").[3] In 2008, Union Pacific and Asarco entered into a settlement agreement ("Bankruptcy Settlement") which was approved by the Bankruptcy Court on October 14, 2008. (Dkt. 130-4, Ex. 1) (Dkt. 130-28, Ex. 16) (Dkt. 130-39, Ex. 22.)

The United States' POCs asserted Asarco was jointly and severally liable for more than $2 billion in cleanup costs at OU3 of the CDA Site. On March 13, 2009, Asarco and the United States entered into a settlement ("CDA Settlement") whereby Asarco agreed to pay approximately $482 million to resolve its CERCLA liability at the CDA Site. (Dkt. 24 at ¶ 37) (Dkt. 130-6, Ex. 3.) On June 5, 2009, the Bankruptcy Court approved the CDA Settlement. On November 13, 2009, the Bankruptcy Court approved Asarco's Confirmed Plan of Reorganization ("Confirmed Plan"), effective December 9, 2009, which provided

---

[3] Union Pacific's briefing identifies "the CDA Site" as the Bunker Hill Mining and Metallurgical Complex Superfund Site (the "Bunker Hill Complex"). (Dkt. 130 at 2 n. 3.) The FAC defines "the CDA Site" as consisting of a 1,500 square mile area located in northern Idaho and eastern Washington that includes the Bunker Hill Complex and a twenty-one square mile area referred to as "the Box." (Dkt. 24 at ¶ 1.) The Bunker Hill Complex consists of three operable units ("OU"). OU1 and OU2 are located within the Box. A 1994 consent decree governs the mining companies' liability for OU1 inside the Box. *Asarco*, 280 F.Supp.2d at 1108. Clean-up of OU2 was funded by the United States and the State of Idaho. OU3 consists of areas located outside of the Box where mining related contamination has come to be located within the CDA Basin. (Dkt. 24 at ¶ 27) (Dkt. 130 at 2, n. 3) (Dkt. 149, Ex. A.)

MEMORANDUM DECISION AND ORDER - 3

the funding for the CDA Settlement payout. (Dkt. 24 at ¶¶ 38, 39) (Dkt. 130-40, Ex. 23.) Thereafter, ASARCO made $482.143 million in payments under the CDA Settlement to resolve its environmental liabilities at the CDA Site. (Dkt. 24 at ¶¶ 37, 39.)

## 2.    This Case

On June 5, 2012, Asarco filed the Complaint in this matter seeking contribution under § 113(f) of CERCLA to recoup from Union Pacific a portion of the $482 million it paid under the CDA Settlement. (Dkt. 1.) The claim alleges Asarco overpaid its share of the costs for remediation under the CDA Settlement and that Union Pacific should pay "its equitable share of any overpayment of costs by Asarco at the Site." (Dkt. 24 at ¶ 75.) Asarco alleges five separate bases for Union Pacific's liability under CERCLA for the costs to remediate the environmental harm Union Pacific, and its predecessors, caused within the CDA Site. (Dkt. 24 at ¶¶ 44-50.) In particular, Asarco's claim alleges Union Pacific, or its predecessors, constructed rail beds out of mining wastes – "jig tailings" – that contained hazardous substances which were released into the environment and contaminated the CDA Site and the CDA Water System.[4] (Dkt. 24 at ¶ 45) (Dkt. 131 at 1-3.) Asarco further alleges Union Pacific is responsible for hazardous releases within the Site as a result of its arranging, use, transportation, spills, and/or other discharges of ore and ore slurry. (Dkt. 24 at ¶¶ 46-50.)

---

[4] Asarco defines the "CDA Water System" as the CDA River, Lake CDA, and the Spokane River. (Dkt. 149, Ex. A at 52.) Union Pacific disputes the use of this term. (Dkt. 172 at 15 n. 12.)

MEMORANDUM DECISION AND ORDER - 4

On July 23, 2012, Asarco filed its First Amended Complaint ("FAC") amending its allegations relating to and the definition of the "CDA Basin" to include the drainage of the North Fork of the CDA River (the "North Fork"). (Dkt. 24.)[5] Union Pacific filed a Motion to Dismiss which this Court granted. (Dkt. 31 50.) Asarco appealed that decision and the Ninth Circuit reversed the dismissal. *See Asarco, LLC v. Union Pacific R. Co.*, 765 F.3d 999 (9th Cir. 2014). The case was reopened and the parties filed their Cross-Motions for Summary Judgment and related submissions which the Court takes up in this Order.

## STANDARD OF LAW

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure which provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "material" if it affects the outcome of the litigation and may be considered "genuine" if it is established by "sufficient evidence supporting the claimed factual dispute…to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat'l Bank v. Cities Serv. Co. Inc.*, 391 U.S. 253, 289 (1968)); s*ee also British Motor Car Distrib. v.*

---

[5] In their filings, the parties have differing uses and definitions for the terms "CDA Site" and "CDA Basin." They also dispute whether: the North Fork is properly included in Asarco's claim in this case, was part of the CDA Settlement, and/or is contained in OU3. (Dkt. 130 at 2 n. 2 and 4) (Dkt. 130-2, SOF at ¶¶ 3, 6) (Dkt. 152 at ¶ 2.) The parties further dispute whether Union Pacific's contribution protection includes the North Fork. (Dkt. 131 at 9 n. 6.)

*San Francisco Auto. Indus. Welfare Fund*, 882 F.2d 371 (9th Cir. 1989). In order to

withstand a motion for summary judgment, a party

> (1) must make a showing sufficient to establish a genuine issue of fact with
> respect to any element for which it bears the burden of proof; (2) must show
> that there is an issue that may reasonably be resolved in favor of either party;
> and (3) must come forward with more persuasive evidence than would
> otherwise be necessary when the factual context makes the non-moving
> party's claim implausible.

*British Motor Car*, 882 F.2d at 374 (citation omitted). When applying this standard, the

court views all of the evidence in the light most favorable to the non-moving party.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Hughes v. United States*, 953

F.2d 531, 541 (9th Cir. 1992).

## DISCUSSION

**1.     Motions to Strike**

**A.     Motion to Strike Expert Declaration of Paul Cunningham.**

Asarco filed Paul Cunningham's Declaration in support of its position that Union

Pacific is the successor to certain rail lines located in the CDA Basin and, therefore, subject

to its contribution claim. (Dkt. 135.) Union Pacific seeks to exclude the Declaration arguing

it is unsupported by facts or evidence, improperly expresses legal conclusions, and fails to

meet the standards for admissible expert testimony. (Dkt. 145, 181.) Asarco maintains the

Declaration is reliable, useful, and satisfies the requirements for expert testimony. (Dkt.

175.)

The Court may consider expert opinion testimony in ruling on a summary judgment

motion so long as it contains facts that would be admissible at trial and the opinion is based

on the expert's personal knowledge. In considering expert testimony, the Court has a "gatekeeping responsibility" to objectively screen such testimony to ensure that it "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999). This obligation "applies not only to testimony based on 'scientific knowledge,' but also to testimony based on 'technical' and 'other specialized' knowledge." *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) (quoting *Kumho Tire supra*). Prior to considering proffered expert testimony, a trial court "must merely make a determination as to the proposed expert's qualifications" as well as the relevance and reliability of the testimony. *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1124 (9th Cir. 1994). A court is not to attempt to determine whether an expert's conclusions are correct, but rather examine only "the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*"). On a motion for summary judgment, the Court does not weigh the persuasiveness or credibility of an expert but, instead, only determines whether there is a genuine issue for trial.

### i)    Expert Qualifications

Rule 702 requires that a testifying expert be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Rule 702 "contemplates a broad conception of expert qualifications" and is "intended to embrace more than a narrow definition of qualified expert." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994); *see also* Fed. R. Evid. 702 advisory committee's note ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert

MEMORANDUM DECISION AND ORDER - 7

testimony."). Union Pacific argues Mr. Cunningham is not qualified as an expert in this case. (Dkt. 181.) The Court disagrees.

Mr. Cunningham's professional practice and experience since 1972 has been in railroad development, operation, reorganization, abandonment and discontinuance, growth by acquisition and combination, and regulation. (Dkt. 135 at ¶ 2.) Union Pacific's challenges to his qualifications are matters that go to Mr. Cunningham's credibility. (Dkt. 181 at 3-5.) The Court finds for purposes of summary judgment, that Mr. Cunningham is qualified as an expert.

### ii)       Relevant and Reliable

In addition to being qualified, the "[e]xpert testimony [must] be both relevant and reliable." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (citations and quotations omitted). Relevancy "simply requires that the evidence...logically advance a material aspect of the party's case." *Id.* at 463 (citation and marks omitted). Rule 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. To be admissible, evidence must also be relevant under Rule 402 and its probative value must not be substantially outweighed by the danger of unfair prejudice under Rule 403.

The reliability prong of Rule 702 requires that expert testimony be based on sound principles and methodology. Reliability requires the court to assess "whether an expert's testimony has a 'reliable basis in the knowledge and experience of the relevant discipline.'" *Estate of Barabin*, 740 F.3d at 4683 (quoting *Kumho Tire*, 526 U.S. at 149 (citations

MEMORANDUM DECISION AND ORDER - 8

omitted)). Where, as here, the Court is considering the reliability of non-scientific testimony, the *Daubert* factors of peer review, publication, and potential error rate are not applicable as the reliability of the testimony "depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Hankey*, 203 F.3d at 1169; *see also Kumho Tire*, 526 U.S. at 150.

Courts are afforded "broad discretion" when determining whether an expert's testimony is reliable. *Hankey*, 203 F.3d at 1167-68. In making this determination, the court must rule not on the correctness of the expert's conclusions but on the soundness of the methodology, *Estate of Barabin*, 740 F.3d at 463 (citation omitted), and the analytical connection between the data, the methodology, and the expert's conclusions, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). *See also Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) ("Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs."); Fed. R. Evid. 702 advisory committee's notes to 2000 amendments ("[T]he testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case."). The "proponent of the expert...has the burden of proving admissibility." *Cooper*, 510 F.3d at 942; *see also Daubert II*, 43 F.3d at 1316.

In this case, the Court finds Mr. Cunningham's Declaration to be relevant and reliable for purposes of deciding the summary judgment motions in this case. The statements in the Declaration are based on Mr. Cunningham's knowledge and experience in the railroad industry and his review of the materials in this case. (Dkt. 135.) The Declaration is relevant as it provides specialized knowledge and expertise concerning the

railroad industry and the particular areas at issue on summary judgment concerning railroad development, reorganization, abandonment, acquisition, combination, and regulation. As such, the Court finds the Declaration is useful, relevant, and will assist in ruling on the summary judgment motions.

The Motion to Strike is denied. This ruling is limited to the Court's consideration of Mr. Cunningham's Declaration in deciding the Motions for Summary Judgment.

### B. Union Pacific's Motion to Strike Linda Larson's Affidavit

Union Pacific seeks to strike Linda Larson's Affidavit filed in support of Asarco's response in opposition to Union Pacific's Motion for Summary Judgment and Cross-Motion for Partial Summary Judgment. (Dkt. 164, 187.) Union Pacific argues the Affidavit consists of improper attorney-witness testimony and Ms. Larson was not timely disclosed. Alternatively, Union Pacific asks that discovery be reopened to allow it to depose Ms. Larson and supplement its briefing. If the Affidavit is allowed, Union Pacific asks that Ms. Larson be disqualified from representing Asarco in this matter. Asarco responds arguing the Affidavit is proper and contains admissible statements, Ms. Larson was disclosed, and there is no basis for disqualification. (Dkt. 183.) The Court did not rely on Ms. Larson's Affidavit in ruling on the Motion for Summary Judgment. As such, the Motion to Strike and alternative requests for relief are moot.

Union Pacific has filed a related Motion to Reopen Discovery to depose Ms. Larson and disqualify her as counsel for Asarco in this matter. (Dkt. 193, 203.) Asarco opposes the Motion. (Dkt. 201.) The Court denies the Motion as to the request to disqualify Ms. Larson as counsel in this matter. Such relief is unwarranted at this time.

MEMORANDUM DECISION AND ORDER - 10

As to the request to reopen discovery and depose Ms. Larson, the Court will grant the same if Asarco intends to call Ms. Larson at trial. A great deal of time could be spent delving into the parties' disclosures, discussing the particulars of Rule 26's disclosure requirements, and the rules of professional conduct in order to ferret out this issue but the answer here, at its core, lies in Rule 1 which states that the civil rules of procedure "should be construed, administered, and employed by the court <u>and the parties</u> to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1 (emphasis added).

Union Pacific obviously is and has been aware that Ms. Larson has personal knowledge concerning the Bankruptcy Settlement that is relevant to determining the issues in this case. What Union Pacific does not know is whether Ms. Larson will testify at trial. Had Union Pacific sought to depose her on this matter previously, Asarco would more than likely have objected to any such efforts just as Union Pacific would have done had Asarco sought to depose its counsel with knowledge of the Bankruptcy Settlement. To reach a just, expedient, and inexpensive resolution here simply requires some candor and cooperation by counsel as to whether either side intends to call as a witness at trial any of their attorneys who participated in the Bankruptcy Settlement. If so, fairness demands that notice be given and discovery be conducted.

The trial in this matter is not yet scheduled awaiting the Court's ruling on these and other pending Motions. As such, there is ample time for this limited discovery to take place without undue hardship to either side. Accordingly, the Court will direct both sides to notify the other, in writing, as to whether either intends to call any of their attorneys who

MEMORANDUM DECISION AND ORDER - 11

were involved in negotiating the Bankruptcy Settlement, who have not been previously disclosed and/or deposed, to testify at the trial in this case. Such notice shall be made within ten (10) days of the date of this Order. If any such witnesses are disclosed, the opposing side may depose the same, and the witness shall be made available, within thirty (30) days of the written disclosure notice being received.

**2.      Union Pacific's Motion for Summary Judgment**

Union Pacific's Motion for Summary Judgement seeks dismissal of this action as a matter of law arguing Asarco's contribution claim against it was released in the Bankruptcy Settlement; was not preserved; is barred by Union Pacific's comprehensive contribution protection; and is precluded by both *res judicata* and judicial estoppel. (Dkt. 130, 172.) Asarco contends its contribution claim was not released in the Bankruptcy Settlement; was properly preserved; is not barred by any contribution protection; and is not precluded by either *res judicata* or judicial estoppel. (Dkt. 149.) Asarco further argues the Court should grant summary judgment in its favor on the affirmative defenses raised by Union Pacific's Motion for Summary Judgment. (Dkt. 149 at 1.)

**A.      The Bankruptcy Settlement**

In the appeal of this Court's prior Order of dismissal, the Ninth Circuit found the Bankruptcy Settlement to be ambiguous as to whether Asarco's contribution claim in this case is barred. *Asarco*, 765 F.3d at 1009-1010. Union Pacific maintains the parties intended for the Bankruptcy Settlement to be a global resolution of all claims between it and Asarco as evidenced by the language of the document, extrinsic evidence, and Asarco's post-

MEMORANDUM DECISION AND ORDER - 12

settlement conduct. (Dkt. 130.)[6] Asarco disputes that the evidence cited by Union Pacific establishes the parties' intended for the Bankruptcy Settlement to have released Asarco's contribution claim. (Dkt. 149.)

The Court finds that neither the extrinsic evidence of parties' negotiations, post-settlement conduct, nor the context of the Bankruptcy Settlement itself resolve the ambiguity found by the Ninth Circuit. There were numerous environmental POCs filed in Asarco's bankruptcy case prompting Asarco to request an estimation of its environmental liabilities. Before the Bankruptcy Court made its estimation of liabilities, these parties resolved Union Pacific's two POCs by entering into the Bankruptcy Settlement wherein they estimated Union Pacific's costs at the CDA Site, Asarco's share of liability for those costs, and agreed that Union Pacific would have a general unsecured claim in the amount of $4,157,572.75. (Dkt. 130-4, Ex. 1.) Any future claims relating to the Wallace Branch Site and Wallace Spur Site were excluded from the Bankruptcy Settlement. (Dkt. 130-4, Ex. 1.)

Union Pacific points to Robert Jones, its former bankruptcy counsel and lead negotiator, who testified that both parties intended for the Bankruptcy Settlement to be a "global resolution" of all claims between the parties. (Dkt. 130 at 8-9.) This "global resolution" intention, Union Pacific argues, is further evidenced by letters and emails from

---

[6] Union Pacific further contends that Asarco failed to preserve any contribution claim against it in its plan for reorganization. (Dkt. 130 at 13-15.) Asarco maintains it preserved its contribution claims in the Confirmed Plan. (Dkt. 149 at 3-5, 19-25.) The Court addresses this argument later in this Order.

Union Pacific to Asarco at the outset of the negotiations; the lack of any communications by Asarco that rebut that intention; letters and emails from Linda Larson, Asarco's counsel, stating Asarco's intent was to resolve "all claims"; and Union Pacific's settlement proposal. (Dkt. 130 at 8-10.) Given Asarco's liability for the CDA Site had already been established at twenty-two percent and Union Pacific's POCs included CERCLA response costs and NRD contribution claims, Union Pacific asserts the resulting Bankruptcy Settlement was an allocation of both its and Asarco's respective CERCLA liabilities for the CDA Site. Further, Union Pacific contends the fact that the settlement was reached in the bankruptcy forum explains why the Bankruptcy Settlement refers to claims "by UP" or "UP's claims" but that the parties' intent was still for a global resolution of all the claims between the parties with regard to the CDA Site.

Asarco counters that neither of Union Pacific's POCs identified any right of setoff for contribution claims Asarco might have against it. (Dkt. 149 at 2.) Thus, Asarco argues, the parties' negotiations and resulting Bankruptcy Settlement did not affect or release Asarco's claim against Union Pacific for costs incurred at the CDA Site. Asarco maintains the parties' negotiations never included any discussion or consideration of its potential contribution claims against Union Pacific and, therefore, there was no intent that the Bankruptcy Settlement would apply to or release any such claims. Asarco disputes that the extrinsic evidence pointed to by Union Pacific shows that the parties intended for a "global resolution" of all claims, including its contribution claim. (Dkt. 149 at 9-15.) Asarco instead points to other extrinsic evidence which, it argues, counters Union Pacific's position including: correspondence between the parties, a December 2007 meeting in

MEMORANDUM DECISION AND ORDER - 14

Houston, deposition testimony from individuals involved in the negotiations, and Asarco's settlement proposal. Further, Asarco argues, its contribution claim was not released under Texas law because the Bankruptcy Settlement did not "mention" its contribution claim. (Dkt. 149 at 15-16.) The settlement instead, Asarco asserts, settled only Union Pacific's POCs.

Having fully reviewed the extensive record in this case including the submissions from both sides, the Court finds that genuine issues of material fact exist as to what the parties intended when entering into the Bankruptcy Settlement with regard to Asarco's contribution claim. The language of the document itself is ambiguous in that regard and the parties dispute the extrinsic evidence and evidence of post-settlement conduct. For these reasons, the Court denies the Motion for Summary Judgment on this basis.

**B.      Union Pacific's Contribution Protection**

Union Pacific argues Asarco's contribution claim is barred by its broad contribution protection found in its prior consent decrees. Asarco counters that those consent decrees, both individually and collectively, do not provide Union Pacific with Basin-wide immunity. (Dkt. 149 at 1.) The contribution protection is instead, Asarco argues, limited to the particular sites identified in each of the consent decrees. Because the contribution claim in this case relates to the releases of hazardous waste and other materials from sites other than those addressed in the consent decrees, Asarco maintains Union Pacific has no contribution protection against its claim in this case. (Dkt. 149.) Specifically, Asarco asserts the consent decrees do not protect Union Pacific from its contribution claim relating to releases from the North Fork or other areas that migrated or came to be located in the

MEMORANDUM DECISION AND ORDER - 15

CDA Basin and/or the CDA Water System. (Dkt. 24 at ¶ 55) (Dkt. 149 at 1, 6-8.) Further, Asarco argues Union Pacific's contribution protection does not apply to any past releases from the consent decree sites. (Dkt. 149 at 41-42.) Union Pacific maintains its contribution protection covers any releases at or from its rights-of-way ("ROWs") and/or sites in the CDA Basin, including past releases and any releases that migrated. (Dkt. 172 at 4 n. 5 and 14-15.)

The 1995 Consent Decree relates to Union Pacific's settlement of its liability as to the Bunker Hill Complex, aka the Box. *United States, et al. v. Union Pacific Railroad Co.*, Case No. 3:95-cv-0152-HLR (D. Idaho Sept. 12, 1995)); (Dkt. 154-22, Ex. 22).[7] The 2000 Consent Decree relates to Union Pacific's settlement of liabilities with the CDA Tribe, the State of Idaho, and the United States for response actions and costs from its ROWs, sites, and areas on the Wallace and Mullan Branches ("Wallace-Mullan Branches").[8] (Dkt. 130-7, Ex. 4.) The 2010 Consent Decree with the United States and the State of Idaho resolves Union Pacific's liabilities relating to the Wallace Yard, Hercules Mill Site, and Spur Lines Site located in the South Fork drainage. (Dkt. 130-16, Ex. 5.)[9]

---

[7] The parties agree Union Pacific has contribution protection inside the Box. (Dkt. 149 at 6.)

[8] Union Pacific also paid $2 million to address NRD for the CDA Basin environment. (Dkt. 130-7, Ex. 4.) The 2010 Consent Decree recognizes that under the 1995 and 2000 consent decrees "Union Pacific received, among other things, a full and complete release for all claims for natural resource damages in the Coeur d'Alene Basin Environment." (Dkt. 130-16, Ex. 5 at 2.) Asarco does not seek NRD in this case.

[9] The 2010 Consent Decree was entered into between the United States and the Settling Defendants Union Pacific Railroad Company and BNSF Railway Company. (Dkt. 130-16, Ex. 5.)

MEMORANDUM DECISION AND ORDER - 16

Asarco does not dispute that contribution protection exists for the areas and sites specifically addressed in the consent decrees. Instead, Asarco argues there is no contribution protection for past releases of hazardous materials from Union Pacific's sites or ROWs identified in the consent decrees or for releases from Union Pacific's other sites that migrated into the CDA Site. The Court finds as follows.

### i)      Contribution Protection Includes Past Releases.

The Court finds the contribution protection provided in the consent decrees includes past releases of hazardous materials from Union Pacific's ROWs and sites addressed in those consent decrees. The POCs resolved by the consent decrees included response costs for past releases. *See United States of America, et al. v. Union Pacific Railroad Co., Inc.*, Case No. 3:99-cv-00606-EJL and *United States of America, et al. v. Union Pacific Railroad Co. and BNSF Railway Co.*, 2:09-cv-00392-EJL. The language used in the consent decrees addresses response costs for past releases. (Dkt. 130-7, Ex. 4) (Dkt. 130-16, Ex. 5.) Specifically, the definition of "Matters Addressed" refers to "all response actions <u>taken or to be taken</u>, and all response costs <u>incurred or to be incurred</u>" by any person or entity. (Dkt. 130-7, Ex. 4 at 16-17) (Dkt. 130-16, Ex. 5 at 11) (emphasis added); *see also* (Dkt. 172-8, Ex. 4) (EPA Memorandum by Bruce S. Gelber and Sandra L. Connors, *Defining "Matters Addressed" in CERCLA Settlements*, March 14, 1997) ("Gelber Memo") (recommending the use of an explicit definition of "matters addressed" to clarify the scope of contribution protection in CERCLA settlements). This plain language encompasses response costs for releases incurred both before and after the consent decree was signed; i.e., past releases from the sites are "response costs incurred" for which Union Pacific has contribution

MEMORANDUM DECISION AND ORDER - 17

protection. *See e.g. Asarco, LLC v. Union Pacific R. Co.*, 762 F.3d 744, 749 (8th Cir. 2014). For these reasons, the Court concludes the contribution protection of the consent decrees includes past releases from those site locations identified in each of the agreements.

### ii)     Contribution Protection Includes Releases that Migrated from the Consent Decrees' ROWs, Areas, and Sites.

The Court also finds the contribution protection applies to releases at or from the areas and/or sites identified in the consent decrees that migrated to other areas. The consent decrees afford Union Pacific broad contribution protection for the sites and areas identified therein stating: "The Parties agree, and by entering this Consent Decree this Court finds, that [Union Pacific] is entitled to protection from contribution actions or claims for Matters Addressed in this Consent Decree to the full extent as provided by CERCLA Section 113(f)(2)…." (Dkt. 130-7, Ex. 4 at ¶ 134); *see also* (Dkt. 130-16, Ex. 5 at ¶ 97.)[10] Again, the "Matters Addressed" section of the consent decrees includes "<u>all response actions</u> taken or to be taken, and <u>all response costs incurred</u> or to be incurred" by any person or entity "relating to the presence of Waste Materials at, or the <u>release</u> or threatened release of Waste Materials <u>from</u>" the ROWs, areas, or sites identified in the consent decrees.  (Dkt. 130-7,

---

[10] The wording of the 2010 consent decree varies slightly from the 2000 consent decree. The broad scope of the contribution protection provided, however, is the same: "The Parties agree, and by entering this Consent Decree this Court finds, that each of the Settling Defendants are entitled, as of the Effective Date, to protection from contribution actions or claims as provided by CERCLA Section 113(f)(2)…, for Matters Addressed in this Consent Decree, except that such protection does not extend to contribution actions or claims that a Settling Defendant may seek to assert against the other Settling Defendant." (Dkt. 130-16, Ex. 5 at ¶ 97.)

Ex. 4 at 12-13) (Dkt. 130-16, Ex. 5 at 7) (emphasis added). This language encompasses all releases from the sites and areas addressed in the consent decrees.

Asarco disagrees arguing the definition of "Matters Addressed" relating to the "presence of Waste Materials at, or the release or threatened release of Waste Materials from the ROW," establishes that Union Pacific's contribution protection under the consent decrees does not apply to mining waste that had migrated off its ROW before its work under the consent decree. (Dkt. 149 at 7, 36-42.) That language, however, refers to the location of "Waste Materials," i.e., the presence, release, or threatened release of "Waste Materials," from three areas: 1) the ROW and areas identified in the Statement of Work ("SOW"), 2) all staging areas described in the SOW, and 3) all handling, storage, or disposal areas for Waste Materials approved under the consent decree. (Dkt. 130-7, Ex. 4 at 12-13.) The language does not limit Union Pacific's contribution protection to only the presence or releases of Waste Materials from the sites as of the entry of the consent decree. As determined above, the scope of Union Pacific's contribution protection includes past releases of Waste Materials from the sites. *See* (Dkt. 149 at 37-38) (Dkt. 172 at 17) (both discussing the Gelber Memo). Moreover, the locations of Waste Materials covered in the Matters Addressed section includes releases from the ROW, sites, and areas specified in the consent decrees without limitation to where those materials may have migrated.

Asarco also argues the consent decree's contribution protection is limited to the "Project Area," pointing to certain extrinsic evidence such as the EPA's certification of completion of the 2000 consent decree which noted that Union Pacific's liability is not released for areas beyond the Project Area, the memorandum supporting entry of the 2000

MEMORANDUM DECISION AND ORDER - 19

consent decree, and this Court's Order approving the consent decree. (Dkt. 149 at 6-7, 38-39) (Dkt. 130-70, Ex. 51) (Dkt. 130-72, Ex. 52.) The 2000 consent decree defines the Project Area as:

> "Project Area" shall mean the main line and related sidings of the ROW except as noted below. Project Area shall also include those portions of Plummer Junction which are identified in the SOW as being a part of the Work, including the inactive rail lines within Plummer Junction that are owned or controlled by Union Pacific as well as the portion of the ROW in the Plummer Junction that was abandoned in 1955. The 7.9 mile section of the ROW within the Bunker Hill Superfund Site has been addressed as part of the Bunker Hill Superfund Site Record of Decision (EPA, 1992), and except as otherwise specified in the SOW and its attachments is excluded from this definition. Project Area does not include: (1) the Excluded Rail Lines; (2) the spurs or connecting branch lines outside of the ROW; (3) the Wallace Yard between mile marker 78.5 and 79.8; (4) that portion of the Mullan Branch between mile marker 7.15 and 7.6 that may include encroachments on the ROW from the Lucky Friday Mine haul road; and (5) the areas identified on the RAD Drawings as possible encroachments on the ROW by the Hecla tailings impoundment, the Morning Mine rock dump, the Lucky Friday Mine waste impoundment and the Bums Yaak Mine dump. The Project Area also includes all staging areas, Waste Material handling, storage and disposal areas within the Coeur d'Alene Basin Environment, and other areas to be used by Settling Defendant in connection with performance of the Work as described in the SOW.

(Dkt. 130-7, Ex. 4 at 15.)[11] As used in the consent decree, "Project Area" relates to the location of the "Work" and/or response actions to be completed under the agreement. While true that the parties to the consent decree reserved claims relating to the "Project Area," that term does not define the scope of Union Pacific's protection from contribution actions or claims brought against it. (Dkt. 130-7, Ex. 4 at ¶ 133.) Instead, the consent decree

---

[11] The second paragraph of the 2000 consent decree generally discusses and describes the "Project Area" and what it does and does not include but refers to the specific definition found later in the consent decree that is quoted above. (Dkt. 130-7, Ex. 4 at ¶ 2.)

MEMORANDUM DECISION AND ORDER - 20

uses the term "Matters Addressed" to define Union Pacific's contribution protection. (Dkt. 130-7, Ex. 4 at ¶ 134-136.) Asarco's interpretation of the consent decree in this regard is contrary to the plain language of the document as well as the extrinsic evidence. (Dkt. 172-8, Ex. 4, Gelber Memo.)

For these reasons, the Court finds, as a matter of law, that Union Pacific has contribution protection from Asarco's contribution claim to the extent it seeks to recover for releases, including past releases, of hazardous materials from those areas and sites identified in the consent decrees that migrated into the CDA Site. The plain language of the Consent Decrees makes clear that Union Pacific "is entitled to protection from contribution actions or claims for Matters Addressed in this Consent Decree to the full extent as provided by CERCLA Section 113(f)(2)…" (Dkt. 130-7, Ex. 4 at ¶ 134); (Dkt. 130-16, Ex. 5 at ¶ 97) which includes the "release or threatened release of Waste Materials from either the ROW or Site as defined in the consent decrees." (Dkt. 130-7, Ex. 4 at 16-17) (Dkt. 130-16, Ex. 5 at 11.) Accordingly, summary judgment is granted to the extent Asarco's contribution claim seeks recovery of response costs for releases from the areas and sites specified in the consent decrees, including releases that migrated to other areas in the CDA Site and/or CDA Water System.

### iii)   Contribution Protection is Not Basin-Wide.

Union Pacific does not, however, have Basin-wide contribution protection. The contribution protection is limited to the particular sites identified in the consent decrees and any releases from those sites. Therefore, summary judgment is denied to the extent

Asarco's contribution claim seeks recovery of response costs for releases from other sites that Union Pacific owned or operated that were not identified in the consent decrees.

In order to prevail on such a claim, Asarco must show it has paid or incurred response costs in discharging its § 107(a) liability and that Union Pacific is partially responsible for those costs as a PRP under § 107(a). *See* 42 U.S.C. § 9613(f)(3)(B). The Court finds genuine issues of material fact exist concerning 1) whether Asarco has paid recovery costs to remediate the CDA Water System such that it can now raise a contribution claim to recover the same in this case and 2) whether Asarco can prove releases of hazardous materials from sites owned or operated by Union Pacific, other than those addressed in the consent decrees, have occurred in the CDA Site and/or have migrated to become located within the CDA Site.

As to the first issue, the parties dispute what areas are included in the CDA Site and whether the CDA Settlement included remediation of the CDA Water System; i.e., whether Asarco paid response costs for the CDA Water System. The CDA Settlement does not use the term "CDA Water System." Asarco has coined the term for purposes of this case to mean the CDA River, Lake CDA, and the Spokane River. (Dkt. 149, Ex. A at 52.) Union Pacific disputes the use of this term, noting it was never used in the CDA Settlement and has no meaning with regard to the scope of Union Pacific's contribution protection or

identification of the response costs Asarco paid under the CDA Settlement. (Dkt. 172 at 15 n. 12.)[12]

The CDA Settlement addressed the United States' CERCLA claims against Asarco for the CDA Site. The term "CDA Site," is broadly defined in the CDA Settlement itself to include "mining contaminated areas in the [CDA] River corridor, adjacent floodplains, downstream water bodies, tributaries, and fill areas" and "any location at which hazardous substances from this site have come to be located." (Dkt. 130-6, Ex. 3 at 1.) Asarco's First Amended Complaint in this case uses the same broad language from the CDA Settlement to define the term "CDA Site" for purposes of its contribution claim here. (Dkt. 24 at ¶ 1.) Because these terms are ambiguous, the Court finds a genuine issue of material fact exists on this issue which precludes entry of summary judgment.

As to the second issue, Asarco must show that Union Pacific was an owner or operator of a facility, other than those for which it has contribution protection, which released hazardous materials in the CDA Site or that came to be located in the CDA Site. In particular, the parties dispute whether Asarco's contribution claim regarding releases in the North Fork can be proven and/or is barred by Union Pacific's contribution protection. (Dkt. 130 at 20-21) (Dkt. 130-2, SOF at ¶ 43) (Dkt. 149 at 6-8, 36-42) (Dkt. 152 at ¶¶ 41, 62) (Dkt. 172 at 18.) The consent decrees do not address sites in the North Fork. Therefore,

---

[12] Union Pacific further argues the CDA Settlement did not address the North Fork. (Dkt. 130 at 2 n. 4.)

the consent decrees do not provide Union Pacific contribution protection for releases in the North Fork.

Asarco's claim with regard to the North Fork appears to be that Union Pacific owned ROWs or sites in the North Fork drainage where releases of hazardous materials occurred which migrated into the CDA Water System and came to be located in the CDA Site. (Dkt. 24.)[13] Genuine issues of material fact exist as to whether Asarco can prove that claim. In particular, as to whether Asarco can show it has incurred any response costs in the North Fork, response action on the North Fork is required, and there has been any migration of such releases from Union Pacific's ROWs in the North Fork to the CDA Water System or CDA Site. (Dkt. 130-2, SOF at ¶ 62) (Dkt. 172 at 18.) Summary judgment is denied on this basis.

**C.    *Res Judicata***

"Res judicata, or claim preclusion, provides that a final judgment on the merits of an action precludes the parties from relitigating all issues connected with the action that

---

[13] Asarco's Rule 30(b)(6) witness, John C. Pfahl, agreed at his deposition that Asarco is not asserting it incurred response costs in the North Fork for which it is seeking reimbursement from Union Pacific. (Dkt. 130-38, Ex. 21, Depo. Pfahl at 102:16-21.) Instead, Mr. Pfahl testified that:

> Asarco's settlement was for response costs in the Coeur d'Alene basin. We are not asserting that response costs will occur in the North Fork. We are asserting that tailings used by Union Pacific to construct the railroad in the North Fork washed downstream in the areas where there will be response costs.

(Dkt. 130-38, Ex. 21, Depo. Pfahl at 102:8-14.) Asarco has clarified that its contribution claim seeks response costs related to releases from Union Pacific's ROW in the North Fork that migrated into the CDA Water System. (Dkt. 152 at 13 ¶ 62.)

were or could have been raised in that action." *Rein v. Providian Fin. Corp.*, 252 F.3d 1095, 1098 (9th Cir. 2001). *Res judicata* has four elements:

> "(1) the parties are identical or in privity; (2) the judgment on the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded to a final judgment on the merits; and (4) the same claim or cause of action was involved in both suits."

*Id*. There is no dispute that the first and second elements are met in this case. The parties in this action are identical to those in the bankruptcy proceeding and the Bankruptcy Court is a court of competent jurisdiction. The parties disagree on the third and fourth elements.

### i)    Final Judgment on the Merits

Union Pacific argues Asarco's contribution claim is precluded by *res judicata* because it could have and should have been raised previously as it involves the same liabilities of the same parties for the CDA Site that were resolved when the Bankruptcy Settlement was approved in October of 2008. (Dkt. 130 at 23) (Dkt. 172 at 20-26.) Asarco asserts the Bankruptcy Court's order approving the Bankruptcy Settlement was not a final judgment on the merits of its contribution claim against Union Pacific or Union Pacific's claims as to the Remaining Sites. (Dkt. 149 at 29.) Union Pacific maintains the Bankruptcy Court's approval of the Bankruptcy Settlement was a final judgment on the merits and that Asarco failed to preserve its claim in the Confirmed Plan. (Dkt. 172 at 25.)

As previously determined, questions of fact exists as to whether the Bankruptcy Settlement resolved Asarco's contribution claim in this case. The same is true as to Asarco's argument regarding the Remaining Sites. Asarco argues Union Pacific withdrew

its POC as to the Remaining Sites and, therefore, the Bankruptcy Settlement is not a final adjudication of the merits of Asarco's contribution claim pertaining to the Remaining Sites.

The Bankruptcy Settlement lists the claims and causes of action of Union Pacific to which it applies and provides for a general unsecured claim in the total amount of $4,157,572.75 as allocated amongst Union Pacific's particular claims. In the allocation section, the Bankruptcy Settlement states:

> (e) Remaining Sites equals zero and [Union Pacific] will withdraw its claims related to such sites.

(Dkt. 130-4, Ex. 1 at IV, ¶ 3(e)). As used in the Bankruptcy Settlement, the term "Remaining Sites" collectively refers to areas where Union Pacific claims it incurred response costs including the CDA Site. (Dkt. 130-4, Ex. 1 at p. 2.)

The Court finds a question of fact exists concerning whether the Bankruptcy Settlement resolved Asarco's contribution claim as it pertains to the Remaining Sites. In particular, whether Union Pacific's withdraw of its claims relating to the Remaining Sites under the Bankruptcy Settlement was a final resolution of those sites. Furthermore, as determined below, the Court finds Asarco preserved its claim in the Confirmed Plan.

### ii)    Same Claim or Cause of Action

Union Pacific contends Asarco's contribution claim was resolved or could have been resolved by the Bankruptcy Court's approval of the Bankruptcy Settlement; disputing Asarco's argument that its claim was not known until after the CDA Settlement was approved. (Dkt. 172 at 20-21.) Union Pacific further argues the claim is barred because it arises out of the same transactional nucleus of operative facts as the claims resolved in the

MEMORANDUM DECISION AND ORDER - 26

Bankruptcy Settlement – i.e. the equitable allocation of CERCLA response cost liability between the same parties for the same CDA Site under the same law, facts, and evidence. Asarco argues its contribution claim arises under CERCLA § 113(f)(3)(B) which is only triggered after a party "has resolved its liability to" the government. (Dkt. 149 at 25-26, n. 16.) Thus, Asarco maintains, the claim did not exist until after the CDA Settlement was entered in June of 2009. Further, Asarco asserts there is no identity of claims because its contribution claim does not arise from the same transactional nucleus of operative facts as Union Pacific's claim. (Dkt. 149 at 27.)

The Court finds Union Pacific has not shown that this case raises the same claims that were, or could have been, previously resolved. The contribution claim raised here alleges that Asarco paid more than its allocable share under its agreement with the government in the CDA Settlement for locations and environmental liabilities outside of those covered by Union Pacific's Consent Decrees and the Bankruptcy Settlement. In this respect, this case is distinct from *Asarco, LLC v. Celanese Chemical Co.*, 792 F.3d 1203 (9th Cir. 2015) where the prior private party settlement encompassed the very same contribution claims later brought by Asarco. Because Asarco alleges its contribution claim made under § 113(f)(3)(B) in this case is for different sites and damages from those encompassed in the Bankruptcy Settlement, the Court finds *res judicata* does not apply.

That being the case, it necessarily follows that Asarco's contribution claim is limited to locations and damages not addressed in the Bankruptcy Settlement and/or consent decrees. Consistent with the ruling in *Asarco v. Celanese Chemical*, Asarco cannot recover for any obligations it resolved in the Bankruptcy Settlement. *See Asarco v. Celanese*

MEMORANDUM DECISION AND ORDER - 27

*Chemical*, 792 F.3d at 1214-1215 (stating a party in an earlier settlement may seek contribution from a later settlement, "as long as those settlements cover separate obligations.") As previously determined, a genuine issue of material fact exists as to whether the Bankruptcy Settlement encompassed Asarco's contribution claim raised here.

Union Pacific also asserts that Asarco and the United States entered into a settlement agreement for the Residual Claims (the "Residual Sites Settlement") on July 31, 2008, prior to the Bankruptcy Settlement. (Dkt. 172 at 20 n. 14) (Dkt. 130-2, SOF at ¶¶ 17-19.) The Residual Sites Settlement, Union Pacific argues, set Asarco's liability for the CDA Site OU3 at $482,143,000. (Dkt. 130-54, Ex. 35.) That settlement, however, was not finalized. In October of 2008 the Bankruptcy Court suspended all proceedings on the 2008 plan of reorganization intended to effectuate the Residual Sites Settlement. (Dkt. 130-6, Ex. 3 at 8.) It was not until the CDA Settlement was approved by the Bankruptcy Court in 2009 that the United States' CERCLA claims against Asarco for the CDA Site OU3 were "settled" for purposes of § 113(f)(3)(B) and § 113(g)(3)(B). Thus, even though the amount of the settlement of the United States' claims was approximately the same in both the Residual Sites Settlement to the CDA Settlement, and therefore arguably known by Asarco, the 2009 settlement between the United States and Asarco was not finalized until after the 2008 Bankruptcy Settlement. Asarco's claim in this case is premised upon its contention that it paid more than its allocable share under the CDA Settlement, a claim which it could not have known until that agreement was finalized.

Union Pacific further contends Asarco had outstanding obligations from a 1994 Consent Decree that were encompassed in the CDA Settlement and, therefore, at least some

MEMORANDUM DECISION AND ORDER - 28

of Asarco's current claim is for liabilities triggered in 1994. (Dkt. 172 at 23 n. 17.) Asarco objects to the statement that it violated the 1994 Consent Decree. (Dkt. 152 at ¶ 5.) The 1994 Consent Decree addressed liabilities in OU1 which is not at issue in this case. Therefore, it does not support application of *res judicata* here. (Dkt. 130-2, SOF at ¶ 5.)

For the foregoing reasons, the Court denies Union Pacific's Motion for Summary Judgment based on *res judicata*.

### D.    Judicial Estoppel

Union Pacific asserts Asarco's contribution claim is precluded by judicial estoppel because Asarco has taken inconsistent positions with regard to its representations in Bankruptcy Court and because it failed to preserve its claim. (Dkt. 130 at 26.) Asarco opposes both arguments. (Dkt. 149 at 31-36.)

"Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (citations omitted). Judicial estoppel is invoked to preserve the "general consideration[s] of the orderly administration of justice and regard for dignity of judicial proceedings," and to "protect against a litigant playing fast and loose with the courts." *Id.* (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)). Courts look to three non-exhaustive factors when determining whether judicial estoppel applies: 1) "a party's later position must be clearly inconsistent with its earlier position;" 2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception

MEMORANDUM DECISION AND ORDER - 29

that either the first or the second court was misled;" and 3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001). The burden is on the moving party to show judicial estoppel is warranted. *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012). The Court finds judicial estoppel does not apply here.

As to the first factor, inconsistent positions, Union Pacific contends that Asarco's argument to the Bankruptcy Court that it was settling its allocated fair, divisible share of liability at the CDA Site judicially estops it from now bringing this contribution claim asserting it overpaid. (Dkt. 130 at 26-28.) Asarco counters that it did not concede any disputed issues in the settlements, i.e., the Government's estimation of response costs and Asarco's joint and several liability; the Bankruptcy Court's approval of the CDA Settlement as "fair and reasonable" was not an adjudication of its contribution claims; and no unfair advantage has been shown. (Dkt. 149 at 32-36.) The Court finds Asarco has not taken inconsistent positions. Asarco's representations to the Bankruptcy Court were consistent with the applicable standards under Bankruptcy Rule 9019 and CERCLA.

Rule 9019 affords a bankruptcy court with discretion to approve a compromise and settlement against the bankruptcy estate. Such settlements should be approved "when it is fair, equitable, and in the best interests of the estate." *In re Asarco LLC, et al.*, No. 05-21207, 2009 WL 8176641, at *9-10 (S.D. Tex. June 5, 2009) ("*In re Asarco*") (citation omitted). The CDA Settlement was approved by the Bankruptcy Court on June 5, 2009. *Id*. In doing so, the Bankruptcy Court concluded the CDA Settlement satisfied Rule 9019

MEMORANDUM DECISION AND ORDER - 30

because it benefited the estate by eliminating the need for additional contested hearings, avoided the risk of adverse litigation results, and fixed Asarco's environmental liabilities. *Id*. at 12; *see also Asarco, LLC v. Noranda Mining, Inc.*, No. 16-4045, 2017 WL 24609, at *3 (10th Cir. Jan. 3, 2017).

The Bankruptcy Court also concluded the CDA Settlement satisfied CERCLA's requirements that the settlement is "reasonable, fair, and consistent with [CERCLA's] statutory aims." *Id*. at 37. Fairness under CERCLA requires that the settlement be both procedurally fair, which involves examining the negotiation process for candor and good faith, as well as substantively fair, i.e., that the proposed settlement "reflects a reasonable compromise of the litigation." *Id*. at 38. The Bankruptcy Court when on to state:

> To be fair to other non-settling responsible parties, a settlement should recover at least an amount "roughly correlated with[ ] some acceptable measure of comparative fault," apportioning liability "according to rational (if necessarily imprecise) estimates" of fair shares of liability for a given facility. *Cannons Eng'g*, 899 F.2d at 87. Although the settlement should have "some reasonable linkage" to the proportionate share of the settling parties, id., "[r]easonable linkage" does not mean that the agency must choose "the best or even the fairest method of apportioning liability." *Wallace*, 893 F.Supp. at 633; *Cannons Eng'g*, 899 F.2d at 88.

*Id.* at 38 ¶ 194. The Bankruptcy Court held that the CDA Settlement met CERCLA's standard because it generally addressed the litigation risks associated with the inherent difficulty of proving future cleanup costs and the settlement amounts correlated roughly to Asarco's comparable fault. *Id.* at 36-45; *see also Asarco v. Noranda Mining*, 2017 WL 24609, at *3.

This Court finds Asarco's contribution claim seeking recovery for amounts it overpaid in the CDA Settlement is not inconsistent with the arguments Asarco made to the

MEMORANDUM DECISION AND ORDER - 31

Bankruptcy Court. Just the opposite, the contribution claim is consistent with the process allowed for under CERCLA. *See* 42 U.S.C. § 9613(f); *Asarco v. Noranda Mining*, 2017 WL 24609, at *5-6.

As to the second judicial estoppel factor, the Court finds there is no impression that any court has been misled by Asarco's claims. Again, the contribution claim in this case is not inconsistent with Asarco's position before the Bankruptcy Court. Moreover, the Bankruptcy Court was aware of and approved Asarco's reservation of its right to bring contribution actions against other PRPs in the CDA Settlement as well as the Confirmed Plan. (Dkt. 130-40, Ex. 23); *In re Asarco*, 2009 WL 8176641.

The Court further finds Asarco preserved its contribution claim for the CDA Site. A debtor who has obtained relief in bankruptcy is judicially estopped "from asserting a cause of action not raised in a reorganization plan or otherwise mentioned in the debtor's schedules or disclosure statements" if the debtor had knowledge of enough facts to know at the time that a potential cause of action existed. *Hamilton*, 270 F.3d at 783–84 ("[A] debtor who failed to disclose a pending claim as an asset in a bankruptcy proceeding where debts were permanently discharged was estopped from pursuing such claim in a subsequent proceeding.") (citation and emphasis omitted).

Asarco's Confirmed Plan vests to the reorganized Asarco entity "any and all claims and causes of action owned by ASARCO…, including, without limitation, for indemnity and contribution for environmental damages, harm or injury, which PRP claims have not

been discharged or settled as of the Effective Date." (Dkt. 130-40 at ¶ 10.13.)[14] Attached

to the Confirmed Plan is a Schedule of Preserved Litigation Claims which similarly states:

> 9.   <u>PRP Claims</u> – Reorganized ASARCO expressly reserves unto itself, its successors, heirs and assigns, all rights and interests in actions and/or claims against third parties ("potentially responsible parties" or "PRP"), for indemnity and contribution for environmental damages, harm or injury, which PRP claims have not been discharged or settled in this bankruptcy.

(Dkt. 130-40, Parent's Plan Ex. 9 at ¶ 9.) The corresponding table lists a number of specific

sites including "CDA (Box and Basin)."

The Court finds this language in the Confirmed Plan preserved Asarco's

contribution claims for the CDA Site. *See e.g. Asarco LLC v. Atlantic Richfield Co.*, No.

CV 12-53-H-DLC, 2012 WL 5995662, at *4 (D. MT, Nov. 30, 2012). The Confirmed

Plan's reservation of rights includes "any and all" claims and specifies contribution claims

for environmental damages. The Schedule of Preserved Litigation Claims also expressly

reserved claims against other PRPs for contribution actions and specifically lists the "CDA

(Box and Basin)" as a one of the preserved claims. Although, unlike many other sites, no

lead defendant is named for the "CDA (Box and Basin)," the Court finds the Confirmed

Plan adequately disclosed the potential contribution cause of action for the CDA Site.

*Hamilton*, 270 F.3d at 783–84.

As to the final judicial estoppel factor, the Court concludes Asarco has not obtained

an unfair advantage nor has Union Pacific been placed at an unfair detriment in this case.

---

[14] The "Effective Date" means, and shall occur on, the first Business Day upon which all of the conditions to occurrence of the Effective Date contained in Article 9.1 of the Parent's Plan have been satisfied, or waived pursuant to Article 9.2 of the same. (Dkt. 130-4, Glossary at ¶ 155.)

Again, Asarco has not taken inconsistent positions nor has any court been misled. Asarco preserved the contribution claim it now raises in this case in the bankruptcy proceeding.

For these reasons, the Court finds judicial estoppel does not apply here.

**3.    Asarco's Motion for Partial Summary Judgment**

The parties do not dispute the law governing CERCLA liability applicable to this case. (Dkt. 131 at 13) (Dkt. 150 at 17.) To prevail on its contribution claim, Asarco must prove: 1) Union Pacific falls within one of four classes of "covered persons" subject to the liability provisions of § 107(a) (42 U.S.C. §§ 9607(a)(1)-(4)); 2) the site is a "facility" as defined by CERCLA § 101(9) (42 U.S.C. § 9601(9)); 3) a "release" or "threatened release" of a "hazardous substance" from the facility has occurred (42 U.S.C. § 9607(a)(4)); and 4) the "release" or "threatened release" caused Asarco to incur response costs (42 U.S.C. §§ 9607(a)(4) and (a)(4)(B)). *See City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1002-03 (9th Cir. 2010) (citation omitted); 42 U.S.C. § 9613(f)(3).

Asarco has filed a Motion for Partial Summary Judgement seeking a ruling as to the first two elements of its claim that under CERCLA: 1) Union Pacific is a "covered person," i.e., a former owner-operator of certain rail lines that operated in the CDA Basin by way of state-law successorship liability and 2) those rail lines are "facilities." (Dkt. 131, 171.)[15] Union Pacific opposes the Motion on several grounds. (Dkt. 150.) The Court finds as follows.

---

[15] Union Pacific has filed a Motion to Strike or for Leave to File Sur-Reply relating to an argument raised in Asarco's Reply brief. (Dkt. 190.) The Motion to Strike is deemed moot in light of the Court's ruling on Asarco's Motion for Partial Summary Judgement.

MEMORANDUM DECISION AND ORDER - 34

### A.      Whether Union Pacific is a "Covered Person" Under CERCLA

The four classes of "covered persons" identified as potentially responsible parties

("PPRs") under CERCLA are:

> (1) the owner and operator of ... a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances ["arrangers"], and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities ... or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance ["transporters"]....

42 U.S.C. § 9607(a). CERCLA imposes strict liability for environmental contamination

upon these PRPs. *Burlington Northern, et al. v. United States et al.*, 556 U.S. 599, 608

(2009).

A PPR is directly liable under CERCLA if it managed, directed, or operated a

facility from which hazardous waste was released. *United States v. Bestfoods*, 524 U.S. 51,

66-67 (1998) (distinguishing direct liability of a parent corporation based on its interaction

with a subsidiary's facility from derivative liability based on the parent corporation's

control of the subsidiary). A PPR can be derivatively liable under CERCLA through

successor liability. *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d

358, 364 (9th Cir. 1997) (discussing *Louisiana–Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1262 (9th Cir. 1990) (Congress intended successor liability under CERCLA.)).

Asarco alleges that Union Pacific was an owner or operator of several rail lines in the CDA Basin as the corporate successor to the predecessor entities that constructed, owned, or operated the rail lines and, therefore, is the successor in liability under CERCLA. Union Pacific argues it is the legal successor to only two of the prior entities – Oregon Short Line Railroad Company ("OSL") and Oregon-Washington Railroad & Navigation Company ("OWRN"). (Dkt. 150 at 2.) Union Pacific denies it has successor liability from the other entities that owned rail lines in the CDA Basin.

Corporate successor liability exists under CERCLA such that corporations directly succeed to the liabilities of their predecessors with whom they have merged or have consolidated. *Atchison*, 159 F.3d at 364. Mergers, sales of assets, and changing corporate names does not remove potential CERCLA liability. *Alley v. Miramon*, 614 F.2d 1372, 1384 (5th Cir. 1980); *Bankers Life & Cas. Co. v. Kirtley*, 338 F.2d 1006, 1013 (8th Cir. 1964). CERCLA allows for past owners who never operated the site at a time when hazardous substances were released to be liable merely because they owned the site at issue at some point after the releases. *United States v. Marmon Holdings, Inc.*, Civ. No. 2:10-cv-00526-EJL-CWD, 2015 WL 5822620, at *8 (D. Idaho Sept. 30, 2015).

Although the Ninth Circuit has not expressly resolved whether state law or federal common law governs successor liability under CERCLA, the Ninth Circuit would follow most other courts in applying state law to make that determination. *See Atchison*, 159 F.3d at 364; *United States v. General Battery Corp., Inc.*, 423 F.3d 294, 315 (3rd Cir. 2005)

MEMORANDUM DECISION AND ORDER - 36

("Despite bypassing the question we now consider, it is abundantly clear that the Ninth Circuit, were its hand forced, would follow the recent directives of the Supreme Court and hold that state law should govern successor liability under CERCLA."). Where, as here, there is a question as to which state's law is controlling, the federal court "must look to the forum state's choice of law rules to determine the controlling substantive law." *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002).

Because this case was filed in the District of Idaho, the Court would normally look to Idaho's conflict of law rules. *Id*.[16] In this case, however, the Court need not resolve the choice of law inquiry because although the parties disagree over which state would prevail in the choice of law analysis, they agree on the substance of the law to be applied.[17] (Dkt. 131 at 18) (Dkt. 150 at 13-14) (Dkt. 171 at 7 n. 6.) Moreover, successor liability law is largely consistent across the states and federal courts. *Atchison*, 159 F.3d at 363 (declining to extend traditional successor liability to include a substantial continuation exception). The Court, therefore, will apply the law for corporate successor liability as uniformly stated by the parties.

---

[16] The Idaho Supreme Court applies the most significant relationship test in conflict of law resolution; applying the test set forth in the Restatement (Second) of Conflicts of Laws. *Barber v. State Farm Mutual Auto. Insurance Co.*, 931 P.2d 1195, 1199 (Idaho 1997).

[17] Union Pacific argues Idaho has the most significant relationship to this case because the injury occurred mainly in Idaho. (Dkt.150 at 12-13.) Asarco argues Washington law should apply because some injury occurred in Washington and Idaho courts have not developed successor liability law as fully as Washington. (Dkt. 131 at 17-18.)

MEMORANDUM DECISION AND ORDER - 37

The general rule of successor liability is that "a corporation purchasing the assets of another corporation does not become liable for the debts and liabilities of the selling corporation." *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 572 (9th Cir. 2012) (bankruptcy appeal) (citing *Cambridge Townhomes, LLC v. Pac. Star Roofing, Inc.*, 209 P.3d 863, 868 (Wash. 2009)); *see also State of Wash. v. United States*, 930 F.Supp. 474, 477-78 (W.D. Wash. June 21, 1996). The traditional exceptions to successor non-liability are that asset purchasers are not liable as successor corporations unless:

> (1) The purchasing corporation expressly or impliedly agrees to assume the liability;
>
> (2) The transaction amounts to a "*de-facto*" consolidation or merger;
>
> (3) The purchasing corporation is merely a continuation of the selling corporation; or
>
> (4) The transaction was fraudulently entered into in order to escape liability.

*United States ex rel. Klein v. Omeros Corp.*, 897 F.Supp.2d 1058, 1065-66 (W.D. Wash. Oct. 15, 2012) (quoting *Atchison*, 159 F.3d at 361; citing *Cambridge Townhomes*, 209 P.3d at 868). Corporate successor liability was created to prevent corporations from evading their liabilities through changes of ownership when there is a buy out or a merger. *State of Wash.*, 930 F.Supp. at 478 (citing *United States v. Mexico Feed and Seed Co.*, 980 F.2d 478, 486-87 (8th Cir. 1992)).

In this case, Asarco argues Union Pacific is liable as the successor to numerous prior railroad entities by virtue of a corporate merger or under either the *de facto* merger and/or the mere continuation exceptions.

MEMORANDUM DECISION AND ORDER - 38

"The doctrine of *de facto* merger is an equitable doctrine that recognizes that successor liability may attach 'where one corporation is absorbed by another, but without compliance with the statutory requirements for a merger.'" *United States v. Sterling Centrecorp Inc.*, 960 F.Supp.2d 1025, 1041 (E.D. Cal. 2013) (citations and quotations omitted). Courts typically consider the following factors in determining whether to characterize an asset purchase as a *de facto* merger:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.

> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

> (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

> (4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Id.* at 1041-42 (citing *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 310 (3rd Cir. 1985). "Courts have held that '[n]o one of these factors is either necessary or sufficient to establish a *de facto* merger.'" *Id.* (quoting *In re Acushnet River & New Bedford harbor re Alleged PCB Pollution*, 712 F.Supp. 1010, 1015 (D. Mass 1989)). "The question of whether a transferee of assets is liable for the debts and liabilities of the transferor...must ultimately be decided by weighing the 'policy protecting corporate creditors...against the equally

important policy respecting separate corporate entities.'" *Id.* (quoting *Shannon v. Samuel Langston Co.*, 379 F.Supp. 797, 802 (W.D. Mich. 1974) (internal quotes omitted)).

Under the "mere continuation" exception, a corporation is not to be considered a continuation of the predecessor unless, after the transfer of assets, only one corporation remains, and there is an identity of stock, stockholders, and directors between the two corporations. *State of Wash.*, 930 F.Supp. at 478 (citation omitted). Several factors dictate whether a business is a "mere continuation" of its predecessor, including "a common identity between the officers, directors, and stockholders of the selling and purchasing companies, and the sufficiency of the consideration running to the seller corporation in light of the assets being sold." *Bellingham Ins.*, 702 F.3d at 572 (quoting *Cambridge*, 209 P.3d at 868). "The nub of the inquiry is whether the purchaser represents merely a new hat for the seller." *Id.* (citation and quotation marks omitted).

Here, Asarco argues as the successor to OSL and OWRN by virtue of a 1987 merger, Union Pacific is also the successor to the rail lines owned, constructed, or operated by OWRN and rail lines of other entities that OWRN came to own and/or operate since 1910, when OWRN was first incorporated, including the Washington and Idaho Railroad Company ("WIRR"), Oregon Railroad and Navigation Company ("ORRN"), and Idaho Northern Railroad Company ("INRR"). Under the *de facto merger* and/or mere continuation exceptions, Asarco argues Union Pacific is also liable as a successor for rail lines existing prior to 1910 owned by the same entities listed above as well as Oregon Railway and Navigation Company ("OR&N").

MEMORANDUM DECISION AND ORDER - 40

Having filtered through the voluminous filings relating to these entities, the Court concludes that genuine issues of material fact exist on this issue that preclude summary judgment. The determinations required in order to resolve whether Union Pacific is liable as a successor to the preceding railway companies is an intensely fact-driven inquiry that cannot be decided as a matter of law at this stage given the parties' obvious dispute over the facts. For these reasons, the Court denies Asarco's Motion for Summary Judgement on this issue.

### B.      Whether the Sites are Facilities Under CERCLA

Asarco asks the Court to determine, as a matter of law, that the rail lines at issue on this Motion are "facilities" under CERCLA. (Dkt. 131 at 29-30.) Asarco points to exhibits which, it argues, establishes that Union Pacific and its predecessors used tailings to construct and maintain the rail lines. (Dkt. 171 at 17.) Union Pacific disputes the evidence relied upon by Asarco and opposes summary judgment on this issue. (Dkt. 150 at 30-31.)

CERCLA defines a "facility" as "(A) any building, structure, installation, equipment, pipe or pipeline..., well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located...." 42 U.S.C. § 9601(9). The term "facility" is broadly construed. *Uniroyal Chem. Co. v. Deltech Corp.*, 160 F.3d 238, 245 (5th Cir. 1998) ("it is apparent that facility is defined in the broadest possible terms").

Asarco asks that the "track and track structure" laid on the rail lines' ROWs in this case be deemed a "facility." (Dkt. 131 at 29-30.) While there is evidence in the record that

MEMORANDUM DECISION AND ORDER - 41

hazardous materials were deposited, stored, placed, used, or otherwise came to be located on and/or around the rail lines, genuine issues of material fact preclude granting Asarco's request for summary judgment on this issue. Specifically, the Court finds questions of fact exist as to the particular rail lines where hazardous materials were deposited, the scope of the areas and/or sites where deposits of hazardous materials were allegedly made, and when those deposits occurred.[18] Therefore, the Court denies Asarco's Motion for Summary Judgment as to its request for a ruling that the rail ways are "facilities" under CERCLA.

## 4.    Motion to Bifurcate

Union Pacific has filed a Motion to Bifurcate the trial in this matter asking that the Court first take evidence and decide it's "Bankruptcy Defenses," to-wit 1) whether the Bankruptcy Settlement released Asarco's contribution claim and 2) whether Asarco failed to properly preserve its claim. (Dkt. 128, 166.) Asarco opposes the Motion. (Dkt. 146.)

The standard course of litigation is for all claims and issues in a civil action to be presented for resolution in one trial. Federal Rule of Civil Procedure 42(b), however, allows district courts to bifurcate a trial for any one of the following reasons: (1) "convenience," (2) "to avoid prejudice," or (3) "to expedite and economize." Fed. R. Civ. P. 42(b). The Rule "confers broad discretion upon the district court to bifurcate a trial, thereby deferring costly and possibly unnecessary proceedings pending resolution of potentially dispositive preliminary issues." *Zivkovic v. Southern Cal. Edison Co.*, 302 F.3d

---

[18] The Court has already concluded issues of fact exist as to whether Asarco can prove any releases occurred from the sites and/or whether Asarco incurred response costs.

MEMORANDUM DECISION AND ORDER - 42

1080, 1088 (9th Cir. 2002); *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004).

Bifurcation of the trial in this case is not warranted. This lawsuit presents one claim between two parties. While many issues and a voluminous record must be addressed in order to resolve that claim, the ruling stated in this Order on the "Bankruptcy Defenses" and consent decrees narrow the issues somewhat. The most convenient, expedited, and economical procedure for this case is to resolve the remaining issues at one time. Preparing for and holding one proceeding is more convenient for the court and the parties. Neither side will suffer undue prejudiced by resolving the issues in one proceeding. For these reasons, the Court denies the Motion to Bifurcate.

**5.    Trial Setting**

Before setting this matter for trial, the Court directs the parties to confer and discuss pursuing ADR, Mediation, or other settlement negotiations. After doing so, the parties shall file a joint notice with the Court indicating whether they will attempt settlement discussions of this matter or whether they desire to proceed to trial. Such conference shall occur within thirty (30) days of the date of this Order. The joint notice shall be filed within forty-five (45) days of the date of this Order.

**ORDER**

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1)    Defendant's Motion to Bifurcate (Dkt. 128) is **DENIED**.

2)    Defendants' Motion for Summary Judgment (Dkt. 130) is **GRANTED IN PART AND DENIED IN PART**.

MEMORANDUM DECISION AND ORDER - 43

3)    Plaintiff's Motion for Partial Summary Judgment (Dkt. 131) is **DENIED**.

4)    Defendants' Motion to Strike (Dkt. 145) is **DENIED**.

5)    Defendants' Motion to Strike (Dkt. 164) is **MOOT**.

6)    Defendants' Motion to Strike or for Leave to File Sur-Reply (Dkt. 190)

      **MOOT**.

7)    Defendant's Motion to Depose (Dkt. 193) is **GRANTED** as stated herein.

DATED: February 16, 2017

Edward J. Lodge
United States District Judge