# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ASARCO, LLC,<br><br>        Plaintiff,<br><br>  v.<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>        Defendant. | Case No. 2:12-cv-00283-EJL<br><br>**ORDER** |

## INTRODUCTION

Plaintiff, Asarco, LLC, has brought a contribution claim against Defendant, Union Pacific Railroad Company, under § 113(f) of the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675. Union Pacific argues Asarco has no right to bring a contribution claim, denies it is liable under CERCLA, and contends that Asarco released any contribution claim against it in the parties' Bankruptcy Settlement.

The Court has jurisdiction over this matter under 28 U.S.C. § 1331. On November 21, 2017, the Court completed a thirteen-day bench trial. Thereafter, the parties filed post-trial briefing. Having weighed and evaluated all of the evidence presented and fully considering the legal arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

The following facts are relevant to the Court's ruling herein and were proven by a preponderance of the evidence at the trial.[1]

I.   **Background Facts and Proceedings**

A.   **Coeur d'Alene Basin**

1. The "Coeur d'Alene Basin" ("CDA Basin")[2] encompasses the watershed of the CDA River, part of the Spokane River and Lake CDA. The headwaters of the South Fork of the CDA River ("South Fork") begin in the Bitterroot Mountain Range at the Idaho-Montana border, and the river flows westward past the town of Mullan to Wallace, Idaho, where it joins Canyon and Ninemile Creeks. The river flows past Osburn, Kellogg, Smelterville, and Pinehurst. Below Pinehurst, the South Fork joins the North Fork of the CDA River ("North Fork"), and the river empties into the 25-mile-long Lake CDA. Lake CDA is drained by the Spokane River at its northern end. (Dkt. 281.)

2. The Bunker Hill Mining and Metallurgical Complex Superfund Site (the "Site" or "CDA Site") is a 1,500 square mile area located primarily in northern Idaho, in the CDA Basin. The CDA Site was listed on the National Priorities List ("NPL") in 1983 and is assigned CERCLIS identification number IDD048340921. (Dkt. 281.)

3. The Environmental Protection Agency ("EPA") has divided the CDA Site into three operable units ("OU"):

---

[1] The parties submitted written stipulations of fact for trial and stipulations as to certain exhibits which the Court adopts and incorporates herein. (Dkt. 281, 306, and 314-316.)

[2] The terminology used in this Order is consistent with the Court's prior decisions in this case. As used throughout this Order, "CDA" refers to Coeur d'Alene.

(Continued)

a. OU1 includes the populated areas of the Bunker Hill Box ("the Box"),[3]

b. OU2 comprises the non-populated areas of the Box, and

c. OU3 extends from the Idaho-Montana border into the State of Washington and contains floodplains, populated areas, lakes, rivers, and tributaries. OU3 includes areas surrounding and including the South Fork and its tributaries, and areas surrounding and including the main stem of the CDA River down to the depositional areas of the Spokane River, which flows from Lake CDA into Washington State.

(Dkt. 281.)

4. The CDA Site has been impacted as a result of more than 120 years of historical mining, milling, smelting, and related activities by a number of different entities at more than 100 historical mines, and ore processing facilities. (Dkt. 281.)

5. The EPA identified jig tailings, flotation tailings, and other mining wastes as a source of hazardous substances at the CDA Basin. (Dkt. 281.)

**B.      Underlying CERCLA Litigation for the Coeur d'Alene Basin**

1. In 1991, the Coeur d'Alene Tribe ("CDA Tribe") filed a complaint asserting natural resource damages ("NRD") claims under CERCLA against Asarco, Union Pacific, and other potentially responsible parties ("PRPs"). (Dkt. 281); *Coeur d'Alene Tribe v. Asarco Inc.*, Case No. 3:91-cv-00342-EJL ("*CDA Tribe v. Asarco*").

2. In 1994, the United States, the State of Idaho, Asarco, and other PRPs entered into a Consent Decree, Case No. 3:94-cv-00206-EJL ("1994 Consent Decree") addressing OU1. (Dkt. 281.)

---

[3] The "Box" is a twenty-one mile square area located within the CDA Site. Both OU1 and OU2 are contained inside the Box. OU3 is everything in the Site outside of the Box.

3. In 1996, the United States filed a separate action asserting CERCLA claims against Asarco and other PRPs. *United States v. Asarco Inc.*, Case No. 3:96-cv-00122-EJL ("*United States v. Asarco*"). The United States' case was consolidated with the CDA Tribe case in 1996. (Dkt. 281.)

4. After 78 days of trial in the consolidated cases, on September 3, 2003, this Court issued an Order, *Coeur d'Alene Tribe v. Asarco Inc.*, 280 F.Supp. 2d. 1094 (D. Idaho 2003), wherein it made findings of fact and conclusions of law that are relevant to the issues presented in this case. As a result, the parties have adopted the following findings of fact made in that case here:

a. Asarco and/or its predecessors in interest owned and/or operated the following mines and mills: the Tiger-Poorman Mine and Mill; Morning Mine and Mills; Last Chance Mine and Mill and Sweeney Mill; Page and Blackhawk Mines, Page Mill and Page Swamps and Impoundments; Standard-Mammoth Mine and Mills; Helena-Frisco Mine and Mill; Coeur Mine and Mill; Galena Mine and Mill and the Osburn and Galena Tailings Impoundment.

b. Due to the expansion of the railroad lines in northern Idaho, ore production in the CDA mining district started to escalate in the late 1890's. The waste product of the milling process is referred to as tailings. Depending on the method of milling being used the size of the tailings varied. Generally speaking, jig tailings are about 1/2 inch to 3/8 inch in size and floatation tailings are 1/100th of an inch in size. Floatation method dominated by 1926. Tailings were disposed of by impounding or stacking on surface soil, returned to mine as underground fill (sandfill) or discharged directly into waterway (creek or river).

c. Tailings management became a serious issue for all mining companies due to the sheer volume of tailings being released by the mines and mills.

d. After researching or estimating recovery rates and adjusting for impoundments and use of tailings as sandfill during the mining process, Dr. Bull calculated total mine tailings released into the waterways in the CDA Basin at 64,390,000 tons. Asarco is responsible for at least 22% of the historical total and Hecla Mining

Company, Inc.[4] is responsible for at least 31% of the historical total releases of tailings which contained hazardous substances. Together these two Defendants were responsible for over one-half of the total tailings disposed of in the CDA Basin.

e. Dr. Stott used total adjusted production in the CDA Basin of 87,126,000 tons and Asarco responsible for 19,482,000 tons of the total or 22.36%. Exhibits 7258, 7259. Dr. Stott calculated 73,069,953 total CDA Basin tailings after adjustments for impoundments and sandfill and Asarco's share after adjustment of 16,129,415 tons or 22%.

f. Regardless of whether the Court relies on Dr. Bull's or Dr. Stott's calculations, the responsible percentage for Asarco remains 22%.

g. Variations exist in the amount of lead, cadmium, and zinc in the tailings, but all experts agreed tailings contain lead, cadmium, and/or zinc and such are hazardous substances under CERCLA.

h. Defendants Asarco and Hecla presented concrete evidence to support divisibility. The cause or source of the hazardous substances in the CDA Basin was the dumping of tailings into the waterways. The experts on both sides of that case agreed that a "reasonable basis" for apportioning is to consider the amount of mining waste discharged into the water-ways. All of the tailings contained lead, cadmium and/or zinc and it is the damages from these three primary metals from which the Trustees seek relief. For these reasons, the Court found divisibility based on tailings production was reasonable in that case. Asarco is responsible for contributing 22% of the tailings and Hecla is responsible for contributing 31% of the tailings.

(Dkt. 281.)

## II.    Asarco's Chapter 11 Bankruptcy Proceedings

1. On August 9, 2005, Asarco filed a voluntary petition for bankruptcy relief in the Bankruptcy Court for the Southern District of Texas ("Bankruptcy Court"), *In re Asarco LLC, et al.*, Bankr. No. 05-21207, 2009 WL 8176641 (S.D. Tex. June 5, 2009) (the "Bankruptcy Case"); (Dkt. 281.)

---

[4] Hecla Mining Company, Inc. was another named Defendant in the CDA Tribe case who was determined to be an owner/operator under CERCLA of mines and mills in the CDA Basin.

2. In the Bankruptcy Case, Asarco sought a "global" and "comprehensive" resolution of its nationwide environmental liabilities and corporate reorganization under Chapter 11 of the Bankruptcy Code. (Ex. 74); *In re Asarco LLC,* 2009 WL 8176641, at *1.

### A. United States' Proofs of Claim and Settlement with Asarco

1. The United States of America ("Government") filed two (2) relevant Proofs of Claim ("POCs") against Asarco addressing the CDA Site. (Ex. 3, 6.) The second POC, filed July 13, 2006, claimed that Asarco should be held jointly and severally liability for claims relating to OU3 for approximately $2.5 billion in 2008 dollars; $2.0537 billion of which was for response costs. (Dkt. 281); (Ex. 6.)

2. On January 30, 2007, Asarco filed a motion to estimate all of its environmental liabilities so that it could formulate a plan of reorganization and disclosure statement. (Dkt. 281); (Ex. 8.)

3. On May 7, 2007, the United States filed a "General Background Brief" explaining certain provisions of CERCLA and its operation, arguing that liability is presumptively joint and several. (Dkt. 281); (Ex. 10.)

4. Asarco opposed the imposition of joint and several liability, arguing it should only be responsible for 22% of the total claims at the CDA Site, and disputed the United States' estimated damages calculations for OU3 of $2.5 billion, arguing Asarco's total liability for all past and future response costs and NRD associated with the CDA Basin should not exceed $120.5 million. (Ex. 17, 22.)

5. Paul Ammann, the United States' retained cost expert, submitted an expert report, rebuttal report, and proffer in the Bankruptcy Court's estimation hearing which calculates

the cost to remedy OU3 for the next 100 years would be approximately $2.56 billion, with $2.0537 billion of that total being response costs. (Ex. 15, 20, 26.)

6. Jeffrey Zelikson and Richard White, Asarco's retained experts, also submitted expert reports and proffers in the estimation hearing. (Ex. 16, 24, 25.) Mr. Zelikson estimated the gross expected Net Present Value ("NPV") cost for past and future environmental response actions at the CDA Site to be $522.50 million, with Asarco's divisible 22% share of total response costs at OU3 to be between $114.95 million and $143.35 million. (Ex. 25.)

7. On October 9 through 12, 2007, the Bankruptcy Court held four days of hearings to estimate the Government's POCs for the CDA Site. (Dkt. 281.)

8. The Bankruptcy Court never issued a ruling on the Government's POCs or an estimation with respect to the CDA Site. (Dkt. 281); (Ex. 72.)

9. On March 14, 2008, Asarco filed a motion requesting a procedure be established to resolve the environmental claims filed by PRPs - either by disallowance, contribution protection, or estimation. (Ex. 47.) Asarco represented it had reached an agreement in principle with the majority of the creditor constituencies holding claims on the structure of a plan of reorganization and stated that it needed to resolve the environmental claims made by PRPs in anticipation of confirmation of a plan of reorganization. (Ex. 47.)

10. On July 31, 2008, Asarco and the United States entered into a Settlement Agreement Regarding Residual Environmental Claims for the CDA, Omaha, Nebraska, and Tacoma, Washington Sites wherein the parties set Asarco's OU3 liability at the CDA

Site at $482,143,000. (Ex. 54.) The agreement was subject to approval of a plan of reorganization. (Ex. 54.)

11. Also in July 2008, the Asarco-Debtor entities in the bankruptcy proceeding ("Debtors") filed a proposed plan of reorganization. (Ex. 72); *In re Asarco LLC*, 2009 WL 8176641, at *2.

12. On October 20, 2008, however, the Bankruptcy Court suspended all proceedings on the Debtor's proposed plan of reorganization; thus, the 2008 proposed settlement agreement with the United States was never finalized. (Ex. 72); *In re Asarco LLC*, 2009 WL 8176641, at *2.

13.  On March 12, 2009, Asarco filed a motion asking the Bankruptcy Court to approve five independent settlement agreements including the Amended Settlement Agreement and Consent Decree Regarding Residual Environmental Claims for the CDA Site ("CDA Settlement"). (Dkt. 281); (Ex. 71, 72.)

14. Under the CDA Settlement, Asarco agreed to pay $482,143,000 to resolve its OU3 CERCLA liabilities to the Government at the CDA Site as well as a resolution of Asarco's liability under the 1994 Consent Decree. (Dkt. 281); (Ex. 72.)

15. The $482,143,000 Asarco paid to resolve its OU3 CERCLA liabilities to the Government pursuant to the CDA Settlement included NRD and response costs incurred or to be incurred by the Government and is not inconsistent with the National Contingency Plan ("NCP"). (Dkt. 281.)

16. In addition, as a condition of the CDA Settlement, Asarco was relieved of all obligations to perform work under pending consent decrees, unilateral administrative

orders, or administrative orders on consent regarding OU3 and several other sites, including penalties. (Dkt. 281.)

17. Under the terms of the CDA Settlement, the parties agreed that Asarco's CDA owned properties would be placed in an environmental custodial trust, the Successor Coeur d'Alene Custodial and Work Trust (the "Work Trust"). The Work Trust was to own and take title to the properties and perform all work approved by the EPA in satisfaction and fulfillment of Asarco's CERCLA liability at the CDA Site. (Ex. 72.)

18. The EPA is the sole beneficiary of the Work Trust. (Ex. 72.)

19. Asarco retains no ownership or interest in the CDA owned properties. (Ex. 72.)

20. The Work Trust was funded by $359.179 million of the total amount Asarco paid under the settlement. Those funds were applied to two subaccounts: 1) a General Work Account of $330.25 million to perform work at the CDA Site selected by the EPA and 2) a Specialized Work Account of $28.929 million to be used to perform work selected by the EPA as part of its comprehensive remedy at the CDA Site and prioritized by the Department of the Interior ("DOI") and United States Department of Agriculture/Forest Service ("USDA/FS") as co-Natural Resource Trustees. (Ex. 72.)

21. Upon the completion of the environmental actions and reimbursement of any costs relating to the CDA Site, the settlement agreement provides that any remaining funds in the Work Trust will be transferred first in accordance with instructions from the Department of Justice to other custodial trusts established pursuant to the global environmental settlement agreements in the Reorganized Cases with remaining

remediation or restoration to be performed and needing additional funding and, second, to the Superfund. (Ex. 72.)

22. The remainder of Asarco's settlement payment was distributed as follows: $41.464 million towards past costs and future oversite costs at the CDA Site, $14 million for administrative expenses, and $67.5 million for NRD. (Ex. 72.)

23. On March 16, 2009, the Debtors filed another proposed plan of reorganization which was amended several times. (Ex. 76); *In re Asarco LLC*, 2009 WL 8176641, at *3.

24. On May 15, 2009, Asarco's Parent entity, Asarco Incorporated, ("Parent") filed a competing plan of reorganization. (Ex. 81); *In re Asarco LLC*, 2009 WL 8176641, at *3.

25. On June 5, 2009, the Bankruptcy Court approved the CDA Settlement. (Dkt. 281); (Ex. 74, 75.)

26. In August 2009, the Bankruptcy Court issued a Report and Recommendation recommending confirmation of the Parent's Plan of Reorganization. (Ex. 82, 83.)

27. On November 13, 2009, the Texas District Court issued an Order confirming the Bankruptcy Court's Report and Recommendation and approving the Parent's Plan for Reorganization. (Ex. 84.)

28. Asarco fully funded the CDA Settlement when the Bankruptcy Court approved the Parent's Confirmed Plan of Reorganization ("Confirmed Plan") which became effective on December 9, 2009 and provided the funding for the CDA Settlement payout. (Dkt. 281); (Ex. 82, 84.)

**B.    Union Pacific's Proofs of Claim and Settlement with Asarco**

1. On July 31, 2006, Union Pacific filed a POC in the Bankruptcy Case which it later amended on May 14, 2007. (Ex. 5, 11.) Union Pacific's POCs asserted a CERCLA §107 claim seeking an allowance for payment of response costs incurred at various Superfund sites, including the CDA Site, as well as allegedly outstanding freight charges. (Dkt. 281); (Ex. 5, 11.) The total amount of Union Pacific's POCs was for $360 million with $52,037,129 being claims for response costs at the CDA Site. (Ex. 11.)

2. From mid-2007 to September of 2008, Union Pacific and Asarco engaged in negotiations related to both of Union Pacific's POCs. (Dkt. 281.) During that time, the parties exchanged letters, emails, phone calls, offers, and draft agreements wherein they each expressed their intention to reach a global and comprehensive resolution of "all claims" between them. (Ex. 12, 21, 34-46, 48-66.)

3. As part of their negotiations, the parties meet in Houston, Texas in December of 2007. Prior to and following that meeting, the parties exchanged further emails, letters, and spreadsheets reflecting each sides' respective positions and calculations. (Ex. 35-46, 48-50.)

4. In August 2008, Asarco's attorney prepared and proposed the first draft settlement agreement. (Ex. 55.) The parties again exchanged emails and correspondence concerning the wording of the agreement. (Ex. 51-66.)

5. In September 2008, the parties entered into the Settlement Agreement between Asarco, LLC and Union Pacific Railroad Company Regarding Past Environmental Response Costs and Other Commercial Costs ("Bankruptcy Settlement"). (Dkt. 281); (Ex. 67.)

6. On September 18, 2008, the parties filed a Joint Motion seeking court approval of the Bankruptcy Settlement which the Bankruptcy Court granted on October 14, 2008. (Dkt. 281); (Ex. 68, 70.)

7. As it relates to this case, the Bankruptcy Settlement resolved Union Pacific's POCs with regard to outstanding freight charges and past response costs at the CDA Site for which Union Pacific was granted a general and unsecured claim of $4,157,572.75. (Ex. 67.) Union Pacific also reserved its right to bring a claim for Future Costs, defined as additional costs incurred at the Wallace Spur and Wallace Branch sites after December 31, 2007. (Ex. 67.) There was no reservation or preservation of any other claims in the Bankruptcy Settlement.

8. In the Mutual Releases section of the Bankruptcy Settlement, the parties both agreed to release "all damages, losses, expenses, costs, liabilities, claims, demands, suits, causes of action, and complaints, of any kind, character or description, in law or in equity, whether known or unknown, arising out of or in any way connected with: (1) the Freight Charges as of the Petition date; (2) Past Response Costs at Wallace Spur, Wallace Branch…, and (3) Remaining Site Costs." (Ex. 67.)

9. "Remaining Site Costs" are "claims for contribution and indemnity for past and future costs of response under CERCLA incurred by [Union Pacific] at the Remaining Sites," which includes the CDA Site. (Ex. 67.)

10. The parties dispute whether Asarco released its CERCLA contribution claim against Union Pacific in the Bankruptcy Settlement. (Dkt. 334, 335, 337, 338.)

11. Texas law governs the interpretation of the Bankruptcy Settlement.

12. The extrinsic evidence presented at trial shows that at the time of their negotiations, the parties' intended for the Bankruptcy Settlement to be a comprehensive and global resolution of all the claims and causes of action between the parties, with the exception of the reservation for Union Pacific's Future Cost claims, when viewed in the context of the totality of the circumstances surrounding Asarco's bankruptcy proceedings, conduct and positions of the parties, and the communications between the parties.

13. Based on the language of the Bankruptcy Settlement and the extrinsic evidence presented at trial, the Court finds Asarco released its contribution claim against Union Pacific in the Bankruptcy Settlement.

## III. Asarco's Contribution Claim Against Union Pacific

1. On June 5, 2012, Asarco filed its Complaint in this case alleging a § 113(f) CERCLA contribution claim against Union Pacific seeking to recover response costs incurred in OU3 at the CDA Site. (Dkt. 1.)

2. The parties dispute whether Asarco can bring its contribution claim, the amount Asarco paid towards OU3 response costs, the estimated final costs to restore OU3, and whether Union Pacific is liable under CERCLA.

3. On September 12, 2002, the EPA issued a Record of Decision ("2002 ROD") for OU3. (Ex. 2169.) The 2002 ROD selected an interim remedial remedy for OU3 intended to prioritized actions towards providing an adequate level of protectiveness of human health and the environment but was not intended to fully address contamination within the Basin nor to be as protective as the final remedy. (Ex. 2169 at 6.)

4. An Interim ROD Amendment for the Upper Basin of the CDA River was issued in August of 2012 ("2012 ROD") which selected the interim remedial action for the Upper Basin ("Selected Remedy"). (Ex. 2206.) The Selected Remedy identifies remediation activities for the Upper Basin to address surface water, soil, sediments, and groundwater in the Upper Basis as well as actions to protect portions of previously implemented human health remedies. (Ex. 2206 at 4.) The Selected Remedy is intended to be an interim remedy that builds upon the remedies in previous EPA decision documents and updates, modifies, and adds to the previous cleanup actions for the Upper Basin. (Ex. 2206 at 4.)

5. On February 20, 2013, the EPA issued a Superfund Cleanup Implementation Plan 2012-2022 for the Bunker Hill Mining and Metallurgical Complex Superfund Site ("Implementation Plan"). (Ex. 2172.) The Implementation Plan describes the EPA's phased implementation process for remediation activities at the CDA Site from 2012 to 2022. (Ex. 2172.)

6. No final ROD has been issued nor has any final remedy been selected for OU3 at the CDA Site.

7. Asarco's cost expert, Charles Finch, calculated Asarco's payment under the CDA Settlement to be approximately $485 million and estimated OU3 response costs to be between $1.5 billion and $2.158 billion. (TT 729:4-731:11, 737:11-12, 744:9-14, 18-20.) Mr. Finch opines that Asarco paid more than its 22% allocated share of the OU3 response costs by between $153 million and $276 million. (Dkt. 335) (Ex. 1693) (TT 789:12-790:1.)

8. Union Pacific's cost expert, Gayle Koch, challenged the accuracy of Mr. Finch's calculations.

9. Ms. Koch opined, and Union Pacific asserts, that Asarco paid less than its 22% allocated share of liability for the OU3 response costs. (Dkt. 334.)

10. Union Pacific maintains Asarco paid $482.143 million or less under the CDA Settlement and that the final OU3 response cost is unknown but the best estimate of the cost to remedy OU3 at the CDA Site is $2.56 billion as Mr. Ammann presented to the Bankruptcy Court at the estimation hearing. (Ex. 15, 20, 25) (TT 1744:13-23, 1796:12-23.)

11. The Court finds Asarco paid $482,143,000 to resolve its CERCLA liability for OU3 at the CDA Site under the CDA Settlement with the United States. That amount included a total of $414,643,000 in response costs for OU3 and $67.5 million NRD. (Ex. 72.)

12. The Court finds the estimated total response costs for OU3 is $2,050,762,042.01, 22% of which is $451,167,649.24.

13. The Court finds Asarco's payment of $414,643,000 for response costs in OU3 under the CDA Settlement was less than its 22% allocated share of liability in OU3. Therefore, Asarco did not overpay for its 22% share of response costs in OU3 in its settlement with the United States.

14. The Court finds Asarco released its CERCLA contribution claim against Union Pacific in the Bankruptcy Settlement.

## CONCLUSIONS OF LAW

Applying the foregoing Findings of Fact to the legal standards stated below, the Court makes the following conclusions of law.

## I.    Right of Contribution

"Congress enacted CERCLA in 1980 with two goals in mind: (i) to encourage the expeditious and efficient cleanup of hazardous waste sites, and (ii) to ensure that those responsible for hazardous waste contamination pay for the cleanup." *Asarco LLC v. Atlantic Richfield Co.*, 866 F.3d 1108, 1115 (9th Cir. 2017) (citations and quotations omitted); *see also Whittaker Corp. v. United States*, 825 F.3d 1002, 1006 (9th Cir. 2016) ("Congress enacted CERCLA in 1980 to facilitate the remediation of hazardous waste sites and the resolution of liability for the related costs, especially through negotiated settlements."). For those who incur such cleanup costs, CERCLA provides two mechanisms for recovering some or all of those costs from other PRPs through either a cost recovery action under § 107(a) or a contribution action under § 113(f). *See Whittaker*, 825 F.3d at 1006; 42 U.S.C. §§ 9607(a), 9613(f).

In this case, Asarco has brought a contribution action against Union Pacific under § 113(f) which states:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

42 U.S.C. § 9613(f)(1). Essentially § 113(f) allows a PRP who has been compelled to pay response costs to bring a contribution claim against other PRPs if the first PRP has been sued in a § 107 cost recovery action or settled with the government. *Whittaker*, 825 F.3d at

1006; *United States v. Atlantic Research Corp.*, 551 U.S. 128, 138-39 (2007). This case presents the latter situation.

A party has a right to recover contribution only for those costs for which it has been found liable in either a § 107 cost recovery action or by way of a settlement with the government. *Whittaker*, 825 F.3d at 1009. "Contribution is defined as the 'tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault.'" *Atlantic Research*, 551 U.S. at 138-39. (quoting Black's Law Dictionary 353 (8th ed. 2004)). A "right to contribution under § 113(f)(1) is contingent upon an inequitable distribution of common liability among liable parties." *Id.* "A person entitled to recover contribution may recover no more than the amount paid to the plaintiff in excess of the person's comparative share of responsibility." *Whittaker*, 825 F.3d at 1009 (discussing *Atlantic Research* and quoting Restatement (Third) of Torts § 23(b) (2000)).

As the party bringing the CERCLA contribution claim in this case, Asarco has the burden to prove its right to contribution by a preponderance of the evidence. *Asarco LLC v. NI Industries, Inc.*, 106 F.Supp.3d 1015, 1026 (E.D. MO 2015) (citing cases); *see also Trinity Industries, Inc. v. Greenlease Holding Co.*, 173 F.Supp.3d 108, 212 (W.D. Penn. 2016) (citing cases).[5] Meeting that burden does not require "mathematical precision," "scientific certainty," nor "direct documentary evidence." *Id.*

---

[5] The elements of the § 113 contribution claim that Asarco must prove are: 1) Union Pacific falls within one of four classes of "covered persons" subject to the liability provisions of § 107(a) (42 U.S.C. §§ 9607(a)(1)-(4)); 2) the site is a "facility" as defined by CERCLA § 101(9) (42 U.S.C. § (Continued)

Asarco argues it paid substantially more than its 22% proportional share when it paid $485,429,882 to resolve its OU3 CERCLA liabilities with the United States. (Dkt. 335 at 3) (Dkt. 338 at 11-14.) Asarco's cost expert, Charles Finch, estimates Asarco overpaid its 22% divisible share of response costs for OU3 by at least $153 million. (Dkt. 338 at 11.) As such, Asarco maintains it has a right to pursue its contribution claim in this case against Union Pacific.

Union Pacific disputes the amount Asarco claims it paid, arguing Asarco paid $482,143,000 or less. (Dkt. 334, 337.) Union Pacific further contends that Asarco failed to establish that it overpaid its proportional share to settle its OU3 liability with the United States and, therefore, it does not have a right to contribution under § 113(f). (Dkt. 334 at 17) (Dkt. 337 at 9-11.) Specifically, Union Pacific asserts: 1) the final cost of remediating OU3 is not yet known and, therefore, any claim of overpayment is speculation; 2) Asarco's payment and OU3 cost calculations are incorrect; and 3) and Asarco's settlement payment to the United States was less than its allocated share of liability for OU3. (Dkt. 334, 337.)

Having reviewed the evidence presented at trial, the entire record, and the parties' arguments and briefing on this issue, the Court concludes that Asarco has not proven by a preponderance of the evidence that it overpaid its proportional share of liability.

## A. Overpayment Calculation

---

9601(9)); 3) a "release" or "threatened release" of a "hazardous substance" from the facility has occurred (42 U.S.C. § 9607(a)(4)); and 4) the "release" or "threatened release" caused Asarco to incur response costs (42 U.S.C. §§ 9607(a)(4) and (a)(4)(B)). *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1002-03 (9th Cir. 2010) (citation omitted); 42 U.S.C. § 9613(f)(3).

(Continued)

The parties present different methods for calculating whether Asarco overpaid its liabilities in OU3. Asarco argues the calculation should subtract its payment under the CDA Settlement from 22% of the best estimate of OU3 remediation costs. (Ex. 1693.)[6] Union Pacific asserts the proper calculation divides the amount Asarco paid under the CDA Settlement by the OU3 response costs. (Ex. 2425.) Both calculations require the Court to determine 1) the amount Asarco paid under the CDA Settlement and 2) the total response costs for OU3. The Court finds as follows.

### 1.    Amount Paid by Asarco Under the CDA Settlement

Under the terms of the CDA Settlement, Asarco agreed to pay $482.143 million to resolve its OU3 CERCLA liabilities to the United States. (Dkt. 281 at ¶ 17) (Ex. 72.) The $482.143 million figure is broken out as follows:

| | |
|---|---|
| Past and Future Oversight Costs: | $41.464 million |
| General Work Account: | $330.25 million |
| Specialized Work Account: | $28.929 million |
| Administrative Expenses: | $14 million |
| NRD Account: | $67.5 million |

(Ex. 72) (Dkt. 24 at ¶ 63.) The parties dispute these amounts and what should be included in Asarco's payment amount for response costs at the CDA Site.

---

[6] Exhibit 1693 was admitted for illustrative purposes only. (TT 777:14-778:3.) The Court's citation to this exhibit, and all other illustrative exhibits, in this Order is limited to the illustrative purposes for which the exhibits were offered; such as being demonstrative of each parties' positions as to the appropriate figures or calculations to be used in this case. The Court's findings and conclusions contained in this Order, however, are based upon the testimony and evidence admitted at trial.

### a. Past and Future Oversight Costs

The $41.464 million in funds for Past and Future Oversight Costs were deposited in a Site-specific special account for the CDA Site within the EPA's Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the CDA Site. (Ex. 72 at ¶ IV 6(a).) The Court finds this amount is properly included in Asarco's payment figure as those funds are clearly earmarked to be used for response costs.

### b. General and Specialized Work Accounts

The Work Trust was created under the terms of the CDA Settlement. (Ex. 72 at ¶ IV 6(b).) The Work Trust is comprised of two subaccounts: the General Work Account and the Specialized Work Account. The General Work Account funds of $330.25 million are to be used to perform work at the CDA Site selected by the EPA. (Ex. 72 at ¶ IV 6 (b)(i).) The Court finds these funds are properly included in Asarco's payment figure as they are response costs incurred by the EPA to remediate the CDA Site.

The Specialized Work Account funds of $28.929 million are to be used to perform work selected by the EPA as part of its comprehensive remedy at the CDA Site and prioritized by the DOI and USDA/FS as co-Natural Resource Trustees. (Ex. 72 at ¶ IV 6(b)(ii).) Union Pacific disputes whether these funds should be included in Asarco's payment of response costs, arguing these funds may or may not be used for response costs incurred by the EPA. (TT 1745:19-22, 1750:5-7.) The Court finds the funds in the Specialized Work Account should be included in Asarco's payment amount as they are funds which will be used to perform work selected by the EPA as part of its comprehensive

remedy at the CDA Site. While it is possible these funds may be used to remediate NRD, which are not recoverable in this action, the Court finds the funds should be included as they were paid by Asarco in the CDA Settlement and are available to address response costs incurred by the EPA at the CDA Site.

### c.    Administrative Expenses

As to the $14 million in administrative expenses, the CDA Settlement provides that those funds are to be used to perform work and pay future environmental costs and administrative costs with respect to the CDA owned properties. (Ex. 72 at ¶ IV 6(c).) Union Pacific argues this amount should not be included because the funds do not go to pay for response costs but are instead set aside to administer the Work Trust for the CDA owned properties and also because the administrative expenses are not included in Union Pacific's calculation of the estimated future costs for OU3. (TT 1745:23-1747:8, 1750:8-9, 1818:16-1819:13.) Asarco maintains the entire amount of its payment to fund the Work Trust should be included as those funds are available to pay for response costs in OU3. (Dkt. 338 at 13.) Neither party's presentations with regard to the $14 million in administrative expenses was compelling. The Court instead finds the language of the CDA Settlement Agreement itself addresses the issue stating the $14 million in administrative expenses is to be used to "perform work and pay future environmental costs" as well as administrative costs with respect to the CDA owned properties. (Ex. 72 at ¶ IV 6(c).) Thus, these funds may be available to pay for response costs and will be included in Asarco's payment amount.

### d.    NRD Account

The $67.5 million deposited into the DOI Natural Resource Damages Account should not be included in Asarco's payment amount because those funds do not go to pay response costs incurred by the EPA. (Ex. 72 at ¶ IV 6(d).)

### e. Conclusion

Based on the foregoing, the Court concludes that Asarco paid $414,643,000 which is calculated by taking the CDA Settlement figure of $482.143 million minus the $67.5 million allocated for NRD.

### 2. Asarco's Claimed Payment Amount

Asarco argues it paid over $485 million under the CDA Settlement.[7] At the trial, Mr. Finch and other Asarco witnesses testified that Asarco paid $485 million.[8] The Court, however, finds the $485 million figure is not supported by the evidence and overstates Asarco's payment amount.

Mr. Finch testified that the $485 million amount comes from "an EPA document." (TT 737:11-12, 744:9-14.) The "EPA document" Mr. Finch refers to is a screenshot of an

---

[7] Asarco's Complaint and the Stipulation of Facts for Trial both state that Asarco paid $482.143 million to resolve its OU3 CERCLA liabilities to the United States. (Dkt. 24 at ¶¶ 37, 63, 74) (Dkt. 281 at ¶ 17.) During trial and in its post-trial briefing, however, Asarco argues it paid $485,429,882 in response costs for OU3 in its settlement with the United States. (Dkt. 335, 338) (TT 737:11-20.)

[8] Thomas Aldrich, Asarco's Vice President of Environmental Affairs at the time of the settlement, testified that Asarco paid $485 million pursuant to its settlement with the United States that was used to create the Work Trust. (TT 35, 46, 60.) Mr. Aldrich's testimony as to the amount of payment was an approximation of the "settled-upon amount plus interest at the time." (TT 35:22-24.) Similarly, John Pfahl testified on rebuttal that Asarco paid $485,429,882 to establish the Work Trust pointing to the records of the wire transfers made from Asarco to the EPA. (TT 2289:1-7, 20-25, 2290:18-23.) The $485 million amount, however, includes the interest Asarco paid for its late payment which this Court finds should not be included in the payment amount as stated herein.

EPA webpage from July of 2015 which makes a generalized statement of the funds received from Asarco to fund the Bunker Hill Superfund Site cleanup stating Asarco had paid $435 million into the Work Trust and that another $50 million was received directly from the Asarco bankruptcy and also placed in the Work Trust. (Ex. 1693 at 14.) Such generalized statements without supporting materials do not establish the actual amount of Asarco's payment.

Mr. Finch further testified that he calculated Asarco's payment "directly from the…Work Trust documents," stating Asarco's 2009 payment included $436 million, based on the Work Trust Balance, and $48 million, based on the CDA Special Account Balance, for a total of $485,429,882. (TT 744:18-20.)[9] The balances in the Work Trust and CDA Special Account, however, include the interest Asarco paid for its late payment. (Ex. 1693 at 15.)[10] The Court finds the late interest paid by Asarco is not properly included in calculating the amount of Asarco's response cost payment under the CDA Settlement. While those funds are part of the Work Trust and available to be used to pay for response costs, they were not part of the response costs Asarco paid under CDA Settlement. Furthermore, the Court finds Asarco should not benefit from having delayed paying its settlement obligations in such a manner. Had Asarco timely paid, those funds would have

---

[9] On cross-examination, Mr. Finch agreed that the principal amount paid by Asarco in the CDA Settlement was $482.143 million broken down as stated above. (TT 785-788) (Ex. 72.)

[10] Mr. Finch testified that Asarco paid $77.5 million in interest for its late payment and $359 million in principal. (TT 788:11-789:10.)

been available sooner to the Work Trust either to be used to perform remediation work or to be invested by the Trustee.

Mr. Finch also opined that Asarco's payment should include the future earnings of the Work Trust such as the interest and investment gains the Work Trust has made and will make on the principal amount paid. (TT 789:12-790:1.) The Court disagrees. The incomes and gains the Work Trust receives from investing the funds are not attributable to Asarco's payment for response costs. The fact that the Work Trust has managed and invested the funds in such a way that the balance continues to grow does not entitle Asarco to claim those gains in calculating the amount Asarco paid under the CDA Settlement for several reasons. First, the Work Trust investment gains were not paid by Asarco and, therefore, those gains are not amounts Asarco has incurred and can recover in this contribution action. Second, under the terms of the CDA Settlement, Asarco received a "comprehensive," "cash-out" settlement whereby Asarco has no further risk of liability from the United States for remediation of the CDA Site even if the cost of remediation exceeds the amount of the agreed upon settlement. (TT 794:4-23) (TT 1747:18-1748:14) (Ex. 72 at 9.) Since Asarco bears no risk if the Work Trust funds are insufficient or if the trust suffers losses, it necessarily follows that Asarco cannot, in all fairness, reap the benefits of any gains by claiming the Work Trust's earnings as part of its settlement payment. Further, under the terms of the Settlement Agreement and the Work Trust, Asarco has no right or claim to any of the gains or income realized by the Work Trust. (Ex. 85 at ¶ 2.1.1, ¶ 2.1.3.)

For these reasons, the Court concludes that Asarco paid a total of $414,643,000 under the CDA Settlement for response costs in OU3.

### 3. OU3 Response Costs

The parties disagree on the amount of response costs for OU3. Asarco's expert, Mr. Finch, estimated the total remediation costs for OU3 ranges from approximately $1.5 billion to $2.158 billion. In reaching his conclusion, Mr. Finch reviewed several documents including feasibility studies; the 2002 ROD and 2012 Amended ROD; other EPA documents such as Basin Commission Reports, five-year reviews, and SCORPIOS; as well as other expert reports and depositions. (TT 729:4-731:11.)[11]

Union Pacific challenges Mr. Finch's estimate arguing the final cost to remediate OU3 is unknown and the methodology Mr. Finch used to calculate OU3 costs is unreasonable and fails to adhere to the appropriate standards. (Dkt. 334 at 15-19) (Dkt. 337 at 9-13.) Instead, Union Pacific argues the best estimate of the total response costs for OU3 is Mr. Ammann's proffer to the Bankruptcy Court at the 2007 estimation hearing. (Dkt. 334 at 16-17) (TT 1744:13-1745:6, 1762:13-17.)[12] Specifically, Mr. Ammann estimated the future environmental remediation costs incurred by the EPA for OU3 to be $2,053,677,560. (Ex. 26.)[13] When including past costs, agency costs, and NRD, Mr. Ammann's total cost estimate for OU3 was $2,564,719,251. (Ex. 26.)

---

[11] SCORPIOS refers to the Superfund Cost Recovery Package Imaging and On-Line System.

[12] Mr. Ammann was retained by the United States in 2007 to consult and render an opinion estimating the future human health and environmental clean-up costs of OU3. (Ex. 15, 26.) Mr. Ammann did not testify at the Bench Trial in this matter. Union Pacific called Gayle Koch as its expert witness regarding OU3 response costs who testified that Mr. Ammann's estimation was the best estimate of OU3 response costs and rebutted the testimony of Mr. Finch. (TT 1762:13-17.)

[13] The parties in this case jointly agreed to admit, for illustrative purposes only, certain materials filed in the Bankruptcy Court including the parties' briefing; Mr. Ammann's Proffered Testimony, (Continued)

The experts and witnesses each considered various components in arriving at their cost estimates including: human health costs, upper and lower basin ecological costs, Spokane River remediation costs, Lake Management Plan costs, five-year review costs, EPA indirect costs, oversight costs, and past OU3 costs not otherwise included. (Ex. 26, 1693.) The Court finds as follows as to each of these considerations.

### a.    Human Health Costs

Mr. Finch estimates human health costs to be $162,548,970 by taking the actual costs of the already-completed projects as reported in the 2003-2014 Basin Environmental Improvement Project Commission Annual Reports and adding that total to his estimate of the cost to complete the future projects. (TT 747:25-749:13.) Ms. Koch testified that Mr. Finch's human health cost calculation is low because his estimation of the cost of future projects fails to account for the upward trend in costs and improperly assumes the ROD's estimations are final costs. (TT 1835-1836, 1840.)

Based on the evidence in the record, the Court finds Mr. Finch's estimate understates the costs of the future property remediation projects. The reported costs of the completed property clean-up projects is $135,195,000. Mr. Finch estimates the costs for 2005, which were not reported, to be $7,511,779, by averaging the costs from the two immediately preceding years. (TT 748:20-22.) Mr. Finch then opines that the average cost to clean up the remaining 475 properties going forward will be $41,773 per property;

Expert Report, and Rebuttal Expert Report; and the Proffers of Testimony and Reports of other experts. (Ex. 8-20, 22-28, 33.)

yielding a total estimated future cost of $19,842,192. (TT 748:23-749:8) (Ex. 1693 at 21.) Mr. Finch's $41,773 figure is calculated based on the average costs of the completed property projects from prior years. The cost to complete the clean-up of the remaining properties, however, is clearly increasing each year. (Ex. 1693 at 21.) Therefore, estimating the cost to complete the future projects using a long-term average based on past years' costs without accounting for the upward trend in future costs results in an incorrect and artificially low estimation.

As to the future costs, the Court finds Ms. Koch's testimony estimating the average cost of the future clean-up projects to be between $44,000 and $48,000 for each property to be more credible as it is based on the updated costs for 2015 and 2016. (TT 1770:22-1772:16, 1840:11-1841:9.) Multiplying the low-end of that average range, $44,000, to the 475 properties yet to be completed totals $20,900,000 for future property cleanup costs.[14] As to the cost for the projects completed in 2005, the Court adopts Mr. Finch's estimate of $7,511,779 because that figure is based on the cost averages of the immediately preceding two years and, therefore, does not improperly apply a long-term average estimate as Mr. Finch used for his future cost estimate. Adding all of those figures together, the Court concludes the total Human Health Costs are $163,606,779.

### b.    Upper Basin Costs

---

[14] The Court recognizes the possibility that some of the remaining 475 properties may ultimately not need to be remediated but finds it appropriate and reasonable to include all of the properties that have been identified for remediation efforts in this calculation. The estimated costs should include all of the properties with human health concerns that have yet to be addressed. Further, even if some properties are not remediated, it is likely that other properties will cost more to remediate than the average figure ultimately applied here.

Mr. Finch estimates the ecological costs for the Upper Basin to be either $573,387,000 or $674,968,389. (Ex. 1693 at 35.) Union Pacific argues the Court should adopt Mr. Ammann estimated cost of cleanup for the Upper Basin of $681,169,073. (Ex. 26 at Fig. 11.)

Mr. Ammann's estimation was made prior to the release of the 2012 ROD which significantly reduced the scope of the EPA's Preferred Alternative. Mr. Finch took the reduced scope of the 2012 ROD into account by subtracting $707 million from his calculation for sites removed from remediation and other cost reductions. (Ex. 1693 at 22.) Mr. Finch derived a ratio of 22% based on the number of sites retained for potential remediation versus the number of sites initially proposed. Mr. Finch then added $101.58 million back in to his calculation to arrive at his total best estimate for Upper Basin costs of $674.97 million. (Ex. 1693 at 26.)

The Court finds Mr. Finch's reductions and add back calculations are somewhat arbitrary and fail to apply the relevant standards for making such an estimation. While at first blush it seems reasonable to reduce the cost estimate in order to account for the reduced scope of the 2012 ROD's Selected Remedy, other materials in the record establish why such a reduction is not appropriate. Specifically, the 2013 Bunker Hill Mining and Metallurgical Complex Superfund Site Cleanup Implementation Plan wherein the EPA estimated the cost of the Selected Remedy for the Upper Basin to be $635 million. (Ex. 2172 at 5-2) (Ex. 2198 at 12-11.) That figure factors in the significant reduction in costs for the reduced scope of the 2012 ROD's Selected Remedy compared to the EPA's Preferred Alternative that was initially proposed. (Ex. 2198 at 12-1, 12-11.) The Court

finds the EPA's 2013 figure is the most recent and reliable estimation of the Selected Remedy's interim cleanup costs in the Upper Basin.

The Selected Remedy, however, is not the final remedial action for the Upper Basin. (Ex. 2206 at 1, 4, 5, 4-2, 8-1, 10-19, 12-1, 12-2.) While it will address many significant sources of contamination in the Upper Basin and be protective of human health and the environment, the Selected Remedy is "not expected to fully address" surface water contamination at all locations or groundwater contamination. (Ex. 2206 at 12-1.) Additional remediation activities will be necessary in the Upper Basis and, therefore, the final remediation costs for the Upper Basin will ultimately be higher than $635 million.

Based on the evidence and testimony presented at trial, the Court finds Mr. Ammann's estimate of $681,169,073 for cleanup costs in the Upper Basis is the most sound and reasonable figure because it takes into account all of the factors needed to establish the cost of remediating the Upper Basin and applies sound estimation principles. (Ex. 15, 26.) Mr. Finch's estimation, on the other hand, applies arbitrary ratios and calculations and fails to appreciate the EPA's plan for addressing the contamination in the Upper Basin starts with the Selected Remedy as the first phase of the clean-up work which must then be followed up with additional restoration projects before clean-up of the Upper Basis is complete. (Ex. 2172, 2206.)

### c.    Lower Basin Costs

Mr. Finch provides a range of three figures for his estimate of the Lower Basin's Ecological Costs: $573.39 million, $593.97 million, and $819.48 million. (TT 762:13-764:4, 766:11-767:9) (Ex. 1693 at 30.) In his estimate, Mr. Finch compares the costs of the

Lower Basin to those of the Upper Basin and assumes the Lower Basin costs will be less than that of the Upper Basin; calculating the difference between the two to be 88%. (TT 776:18-23) (Ex. 1693 at 28.)

Based on the testimony and evidence offered at trial, the Court finds Mr. Finch's reasoning comparing the Upper and Lower Basin to be unconvincing, an improper analysis, and contrary to the other materials in the record. The two basins are different in the type and scope of the clean-up work needed to remediate each area. (Ex. 2172 at 2-4 to 2-7); *see also* (TT 1763, 1773-1774.) While it is true that work in the Upper Basin is expected to complement the Lower Basin clean-up activities and will likely improve conditions in the Lower Basin, the EPA still expects the cost to clean up the Lower Basin will be "at least as much" and "likely more" than the Upper Basin. (Ex. 2172 at 2-7, 5-2.) This is true regardless of any O&M cost savings in the Lower Basin. (TT 760:21-761:4, 797:1-20, 822:4-22) (Ex. 26 at 7.) Further, Mr. Finch's 88% ratio comparing the Upper and Lower Basins is simply a comparison calculation using Mr. Ammann's figures without any support for making such a comparison. (TT 823:15-825:16.)

Mr. Ammann, on the other hand, estimates the costs of clean up in the Lower Basin to be $596,856,353 based on the scope of the contamination, the EPA's anticipated plan of remediation, and the schedule for those remediation activities. (Ex. 15, 26.) The Court finds Mr. Ammann's estimation is the best estimate in this case because it is based on the evidence in the record; most importantly the EPA's anticipated plan of remediation. Mr. Ammann's estimate appropriately recognizes the EPA's anticipated costs for the Lower Basin itself and is not simply based on a comparison to the Upper Basin.

#### d.     Spokane River Site Costs

Both Mr. Finch and Ms. Koch testified that the cleanup of the Spokane River Site was mostly done and/or completed in 2012. Yet the witnesses gave different figures for the cost of completing that work. Mr. Finch estimates the cost of the Spokane River Cleanup at $10.66 million by taking the mid-point of the ranges of costs used in the 2002 ROD, $4.5 million and $11 million, and escalating that amount to 2009 dollars. (Ex. 1693 at 31.) Ms. Koch adopts Mr. Ammann's estimation of $15,618,610.[15]

The Court finds Mr. Finch's estimation to be arbitrary and based on less recent information than that of Mr. Ammann which recognized the 2002 ROD's range of costs but then goes on to cite to a 2007 EPA report issued after the first Spokane River remedial project had been completed. (Ex. 14, 15.) Mr. Ammann opined that the future costs for completing this remedial work will be in the "upper range" based on the costs of the initial remedial project. (Ex. 15 at 11.) Ultimately, Mr. Ammann concludes the estimated costs for the Spokane River Cleanup to be $15,618,610 million in 2008 dollars.  (Ex. 15 at 10-11) (Ex. 25 at 9.) The Court finds that is best estimate for the cost of the Spokane River Cleanup because it is based on more recent information and sound reasoning.

#### e.     Lake Management Plan

---

[15] Ms. Koch testified the amount was $17 million based on Mr. Ammann's figures for the Spokane River ($15,618,610) and the Lake Management Plan ($1,431,713). (TT 1763:24-25.) As discussed later, the Court will not include the Lake Management Plan costs in the OU3 estimate and, therefore, only discusses the amount attributable to the Spokane River Cleanup in this section.

Mr. Ammann includes $1,431,713 in costs to his OU3 estimation based on a 10% chance that the EPA will take over the Lake Management Plan sometime in the future. (Ex. 25 at 9.) Mr. Finch does not appear to include this amount in his estimation. The Court finds the record does not support including this amount in the estimated costs for OU3 given the low chance the EPA will incur those estimated costs.

### f.    Five-Year Reviews

Mr. Finch estimates five-year review costs will total $6.72 million through 2050; which he testified is conservative because he believes the five-year review costs are already included in his calculation. (TT 765:3-15) (Ex. 1693 at 32, 51.) Mr. Ammann opines that five-year reviews will be conducted for the indefinite future and estimates the cost through 2105 to be $11,455,130. (Ex. 15, 26); *see also* (TT 1764:1-5.) Both Mr. Finch and Mr. Ammann use the EPA's cost figure of $1.5 million dollars for each five-year review.

Mr. Finch's estimation of costs through 2050 appears to be too short of a time frame considering the well-recognized extent of the contamination in the CDA Basin resulting in a low and inaccurate estimation of five-year review costs. (Dkt. 281) (Ex. 2169 at 2) (Ex. 2172 at 2-1, 2-7, 7-1.) The EPA is required to conduct five-year reviews as long as there is contamination at the Site which will be true for the indefinite future. (Ex. 26.) The Court finds $11,455,130 is the most accurate estimation of the five-year review costs because it applies the EPA's $1.5 million per year cost estimate for an appropriate length of time given the high level of contamination in the area.

### g.    EPA Indirect Costs

Union Pacific argues the OU3 response costs should include the EPA's indirect costs in the amount estimated by Mr. Ammann of $515,227,069. (Ex. 26.) Asarco disagrees arguing the EPA will never incur future indirect costs and neither the CDA Settlement nor the Work Trust contemplate paying indirect costs. (Dkt. 335 at 9-10.) Asarco further maintains that Mr. Finch correctly and conservatively calculated the estimated future response costs for OU3 which took into account the indirect costs.

CERCLA permits the EPA to recover "all costs of removal or remedial action incurred by the United States Government…not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A) (emphasis added). "'All costs' include indirect costs such as administrative and other overhead costs incurred in managing the greater Superfund program." *United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1250 (9th Cir. 2005) (citation omitted). Indirect costs are "costs of activities or items that support the selected alternative, but that cannot practically be directly accounted for as costs of the selected alternative." 43 C.F.R. § 11.83(b)(1)(ii); *W.R. Grace*, 429 F.3d at 1250 ("Allocating indirect costs that cannot be directly accounted for as costs of a specific project is a well-established accounting practice."). This includes costs that "are not readily assignable to the selected alternative without a level of effort disproportionate to the results achieved." *Id.* The EPA calculates indirect costs attributable to a specific Superfund site by multiplying the indirect rate by the total direct costs for the specific site. *United States v. W.R. Grace & Co.*, 280 F.Supp.2d 1149, 1185 (D.Mt. 2003).

The Court concludes the EPA's indirect costs should be included in calculating OU3's total response costs in this case in the same manner as applied in *United States v.*

*W.R. Grace.* The Court further concludes that the EPA indirect cost rate used in the 2007 bankruptcy estimation hearing of 33.49% is the appropriate rate to apply here to calculate the indirect costs for the CDA Site. (TT 1770:3-8) (Ex. 15, 26, 2376.) Applying the indirect cost rate of 33.49% to the EPA's total site costs found herein of $1,468,705,945, the Court finds the indirect costs for the CDA Site is $491,869,620.98.

At the trial, Mr. Finch testified that indirect costs were included in "everything" in his calculation and that he used the EPA's figures which, he states, included indirect costs. (TT 676:5-9, 811:19-812:7.) Mr. Finch explained his understanding of how the EPA calculates oversight and applied a "70% indirect rate" to each cost item. (TT 753-755 and 810:9-812:7.) Mr. Finch stated that the 70% indirect cost rate is a "huge" amount to apply to the actual cost items and that it includes indirect contingencies all of which provides a "cushion" making his estimate conservative and reasonable. (TT 754:1-11.)

The problem with Mr. Finch's calculation, however, is that the 70% applied to the actual cost items is different from the EPA's indirect cost rate multiplier. On cross-examination, Mr. Finch was unable to point to any authority or support for his testimony nor was he able to specify where indirect costs were included in his calculation aside from generally stating indirect costs were included. (TT 811:19-24.) The Court finds Mr. Finch's testimony lacks credibility in this regard.

Ms. Koch's testimony pointed out the errors in Mr. Finch's assumptions regarding the EPA's indirect cost rate and proved that the EPA's indirect costs are not included in Mr. Finch's estimate. (TT 1768-1769.) Specifically, Ms. Koch established that neither the ROD's cost figures relied upon by Mr. Finch nor the 70% applied to the actual cost items

include the EPA's indirect costs as Mr. Finch assumed in his calculation. (TT 753-754, 810-811, 1767:14-21, 1768-1769.) The Court finds Mr. Finch's estimation does not correctly include indirect costs.

On rebuttal, Mr. Pfahl testified based on his personal observations that the EPA never incurred the $515 million in indirect costs as indicated in Mr. Ammann's estimate because the Work Trust, not the EPA, is performing the cleanup. (TT 2292:20-22, 2299:19-22.) The Court sustained Union Pacific's objection to Mr. Pfahl testifying as a non-expert on this matter but allowed Mr. Pfahl to proffer his testimony for the record. Nevertheless, if the Court were to consider this argument, it would conclude that the EPA indirect costs should be included regardless of who is performing the cleanup work. *See W.R. Grace*, 280 F.Supp.2d at 1186 ("It is appropriate for EPA to include in its allocation base the indirect costs of those who have performed services for the EPA, such as other agencies and contractors, because all of these costs are considered necessary to cleaning up contaminated sites, and they are included in the total direct cost of the activity at the site."). Mr. Pfahl's testimony to the contrary is inconsistent with the expert testimony offered by Ms. Koch who testified that indirect costs are any costs the EPA incurs, whether by its own personnel or contractors that the EPA hires. (TT 1769:7-17.) Ms. Koch correctly pointed out that the EPA's indirect costs are not specific to the site being remediated but are instead costs incurred agency-wide, regionally, and at headquarters that are calculated by applying an EPA regional cost percentage to the base cost figure. (TT 1769:7-24.) The Court finds Ms. Koch's expert testimony concerning the EPA's indirect costs to be more credible than the non-expert testimony.

Based on the foregoing, the Court finds Union Pacific has proven, that the EPA's indirect costs are not factored into Mr. Finch's calculation and that those costs should be included in the estimation. The Court concludes that the total indirect costs for the CDA Site is $491,869,620.98.

### h.     Oversight Costs

Union Pacific argues Mr. Finch's estimate fails to include certain oversight costs, other than indirect costs, pointing out that Mr. Ammann included oversite costs of 4.6% incurred by the EPA, the State, and the Tribe totaling $67,656,522. (Ex. 26.) Ms. Koch testified that EPA oversight costs, both past and future, are response costs that should be added to the estimation figure which are not included in Mr. Finch's calculation. (TT 1807:21-1809:22, 1820:6-1821:5, 1890:11-22.) Ms. Koch did, however, state that Mr. Finch's estimate may have added in State oversight costs in his future costs amount but he has not included oversight costs for the EPA or the Tribe and no past costs. (TT 1820:6-24.) Mr. Finch testified that he believed oversight costs were already included in his estimate but, regardless, he provided a rebuttal report which applies a 4.6% adjustment to his calculations resulting in an additional $61 million to $77 million in oversight costs. (TT 770:24-772:5, 777:2-6) (Ex. 1693 at 40, 51.)

The Court finds that the OU3 cost estimation should include oversight costs in the amount of 4.6% as applied to the total estimated costs. The total estimated costs determined above are $1,960,575,565.98. Multiplying that figure by 4.6% yields a total oversite cost of $90,186,476.03. The total estimated costs for OU3 is therefore $2,050,762,042.01.

### B.     Conclusion

Applying the above findings to both parties' calculations, the Court finds that under either calculation Asarco paid less than its 22% allocation of liability for response costs in OU3.

Using Asarco's calculation, the settlement payment of $414,643,000 is subtracted from $451,167,649.24, which is 22% of the best estimate of OU3 Costs, $2,050,762,042.01, resulting in an underpayment of $36,524,649.24; that is to say, Asarco's payment of $414,643,000 was $36,524,649.24 less than its 22% liability share of the OU3 response costs.

Under Union Pacific's calculation, Asarco's settlement payment of $414,643,000 is divided by the total estimated OU3 response costs of $2,050,762,042.01 which establishes that Asarco paid only 20.21% of its liability share; less than its 22% proportional share of liability in OU3.

Based on the foregoing, the Court finds Asarco did not pay more than its proportional share of its liability for OU3. Asarco's payment under the CDA Settlement was less than its apportioned 22% liability. As such, Asarco does not have a right to recover contribution under § 113(f). For this reason, the Court finds in favor of Union Pacific. Because this issue is dispositive of Asarco's contribution claim, the Court need not and does not address whether Asarco proved Union Pacific is liable under CERCLA. The Court will, however, address the issues concerning whether Asarco released its right to bring its contribution claim in the parties' Bankruptcy Settlement because that matter is likewise dispositive and is an alternative basis for the Court's ruling in favor of Union Pacific in this matter.

## II.     The Bankruptcy Settlement Agreement

If Asarco had prevailed on its contribution claim, the burden would then shift to Union Pacific to prove its affirmative defense alleging Asarco waived and/or released its contribution claim in the Bankruptcy Settlement. *See United States v. Chapman*, 146 F.3d 1166, 1170 (9th Cir. 1998) (CERCLA § 107(a) claim); *United States v. Iron Mountain Mines, Inc.*, 987 F.Supp. 1263, 1273 (E.D. Cal. 1997) (CERCLA § 107(a) claim).

On appeal of this Court's Order granting Union Pacific's Motion to Dismiss, the Ninth Circuit concluded the Bankruptcy Settlement was ambiguous as to whether Asarco released or waived its right to bring a contribution claim against Union Pacific. (Dkt. 62); *Asarco, LLC v. Union Pacific Railroad Co.*, 765 F.3d 999, 1009-1010 (9th Cir. 2014). Thereafter, on summary judgment, this Court held that the ambiguity found by the Ninth Circuit remained unresolved and that questions of material fact existed as to what the parties intended when they entered into the Bankruptcy Settlement with regard to Asarco's contribution claim. (Dkt. 225.) At the trial, both parties presented evidence, testimony, and arguments on this issue including extrinsic evidence of the parties' subjective intent during the negotiations and drafting of the Bankruptcy Settlement in the form of testimony from some of the individuals involved, as well as documentary evidence such as emails and letters exchanged between the parties. Having carefully reviewed and considered all of the foregoing, and for the reasons stated below, the Court finds Asarco waived and/or released its right to bring its contribution claim in the Bankruptcy Settlement.

### A.     Contract Interpretation under Texas Law

The parties agree that Texas law governs the interpretation of the Bankruptcy Settlement. Under Texas law, courts "construe settlement agreements under normal rules of contract construction." *McWhinney v. Ameriquest Mortg. Sec., Inc.*, No. 01–13–00761–CV, 2014 WL 6853602, at *3 (Tex. App. Dec. 4, 2014). "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). To determine the intent of the parties, the Court examines the entire writing so as to harmonize and give effect to all provisions in the contract, so that no provision is rendered meaningless. *In re Serv. Corp. Int'l*, 355 S.W.3d 655, 661 (Tex. 2011). In doing so, contract terms are given "their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning." *Reeder v. Wood Cty. Energy, LLC,* 395 S.W.3d 789, 794–95 (Tex. 2012) (citation omitted). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). The Court "must enforce the contract as written" and "not rewrite or enlarge a party's obligations as stated in the contract." *Taylor v. Henny*, No. 01–14–00650–CV, 2016 WL 1389151, at *5 (Tex. App. Apr. 7, 2016).[16]

---

[16] At the conclusion of the trial, the Court directed the parties' post-trial briefing to address the law with regard to the "meeting of the minds." The parties both did so. Having reviewed relevant law, the Court concludes the "meeting of the minds" principles apply to contract formation, not interpretation. *See Wells v. Hoisager*, No. 08-15-00052-CV, 2018 WL 1181311, at *5 (Tex. App. March 7, 2018). The Bankruptcy Settlement is a valid, properly formed contract. *Id.* Therefore, issue before the Court in this case is interpretation and resolution of the ambiguity in the contract which is controlled by the law cited above.

## B.    Interpretation of the Bankruptcy Settlement

Union Pacific argues Asarco released its contribution claim in the Bankruptcy Settlement. (Dkt. 334, 337.) In support of its position, Union Pacific points to the use of the terms "global settlement" and "global resolution" in the parties' communications during the negotiations and the language in the Mutual Releases section of the Bankruptcy Settlement. Asarco denies releasing its contribution claim, contending instead that the Bankruptcy Settlement resolved only Union Pacific's claims raised in the POCs and provided a carve-put for possible Future Costs claims, nothing more. (Dkt. 335, 338.)

Words are the tools of our trade and are used to convey the understanding and intent of the parties to a contract. The Court therefore starts its analysis with the express language of the document. *J.M. Davidson*, 128 S.W.3d at 229. The relevant paragraphs of the Mutual Releases section of the Bankruptcy Settlement states:

### V.  MUTUAL RELEASES

4.    UP agrees for itself, and on behalf of its officers, directors, employees, and trustees to hereby release, remise, and discharge ASARCO and its respective successors, assigns, officers, directors, employees, and trustees from any and all damages, losses, expenses, costs, liabilities, claims, demands, suits, causes of action, and complaints, of any kind, character or description, in law or in equity, whether known or unknown, arising out of or in any way connected with: (1) the Freight Charges as of the Petition Date; (2) Past Response Costs at Wallace Spur, Wallace Branch, and the OLS; and (3) Remaining Sites Costs. All claims and rights related to Future Costs are specifically excluded from and not released by this paragraph.

5.    ASARCO agrees for itself, and on behalf of its officers, directors, employees, and trustees to hereby release, remise, and discharge UP and its respective successors, assigns, members, officers, directors, employees, shareholders, equity owners, and trustees from any and all damages, losses, expenses, costs, liabilities, claims, demands, suits, causes of action, and complaints, of any kind, character or description, in law or in equity, whether

known or unknown, arising out of or in any way connected with: (1) the Freight Charges as of the Petition Date; (2) Past Response Costs at Wallace Spur, Wallace Branch, and the OLS; and (3) Remaining Sites Costs. All claims and rights related to Future Costs are specifically excluded from and not released by this paragraph.

(Ex. 67.) [17] Under these paragraphs, the parties released "any and all…claims….of any kind [or] character…whether known or unknown, arising out of or in any way connected with" freight charges; past response costs at the Wallace Spur, Wallace Branch, and OLS; and Remaining Sites Costs. (Ex. 67.) The term "Remaining Sites Costs" refers collectively to three specific sites, including the CDA Site, where Asarco either disputes that it is a PRP or asserts it has contribution protection. (Ex. 67 at 2.) Asarco's contribution claim in this case clearly "arises out of" or is "in any way connected" to the CDA Site and the costs incurred by Union Pacific at the CDA Site as raised in Union Pacific's POCs. Therefore, the Court finds, Asarco waived and/or released its right to bring this contribution claim relating to the CDA Site in this case against Union Pacific. The Court further concludes that Texas law regarding releases is in accord.

Under Texas law, "[a] release is a writing which provides that a duty or obligation owed to one party to the release is discharged immediately or upon the occurrence of a condition." *Henry v. Masson*, 333 S.W.3d 825, 844 (Tex. App. 2010) (citation omitted). "Like any other agreement, a release is subject to the rules of construction governing contracts" which requires that the Court "give effect to the true intentions of the parties as expressed in the written instrument" as of the time of execution of the release. *Katy Int'l,*

---

[17] Union Pacific is referred to as "UP" in the Bankruptcy Settlement.

*Inc. v. Jinchun Jiang*, 451 S.W.3d 74, 88 (Tex. App. 2014); *Sanus/New York Life Health Plan, Inc. v. Dube-Seybold-Sutherland Mgmt., Inc.*, 837 S.W.2d 191, 196 (Tex. App. 1992). "The contract must be read as a whole, rather than by isolating a certain phrase, sentence, or section of the agreement." *Katy Int'l*, 451 S.W.3d at 88. "The language in a contract is to be given its plain meaning unless doing so would defeat the parties' intent." *Id.*

Asarco argues it did not release its contribution claim in the Bankruptcy Settlement because the Mutual Releases paragraphs do not specifically mention the contribution claim, pointing to Texas case law stating: "In order to effectively release a claim in Texas, the releasing instrument must <u>'mention' the claim to be released</u>." *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991) (emphasis added). Any claims not clearly within the subject matter of the release are not discharged, even if those claims existed at the time the release was executed. *Id.*; *Sanus*, 837 S.W.2d at 197. General, categorical release clauses are narrowly construed. *Id.*

Broad-form releases are not, however, forbidden under Texas law, but such releases must "mention" the claims to be released. *Keck, Mahin, & Cate v. Nat. Union Fire Ins. Co.*, 20 S.W.3d 692, 698 (Tex. 2000) (interpreting *Brady supra*). Parties need not anticipate and identify each potential cause of action relating to the subject's released matter. *Id.* (holding the asserted claims arising from the released time period were barred by the parties' release even though the specific cases were not listed in the release). "Although releases generally contemplate claims existing at the time of execution, a valid release may

also encompass unknown claims and damages that develop in the future." *Katy Int'l*, 451 S.W.3d at 88.

The Court finds the language of the Bankruptcy Settlement is sufficiently descript to be a valid release under Texas law; particularly given the highly sophisticated attorneys and parties who negotiated and agreed to the terms of the settlement. *Sanus*, 837 S.W.2d at 196; *Keck*, 20 S.W.3d at 698. The Mutual Releases paragraphs in the Bankruptcy Settlement encompasses "any and all" claims, "whether known or unknown," arising out of or in any way connected with the Remaining Sites Costs; which includes the CDA Site. (Ex. 67.) That language released any and all claims by the parties relating to the CDA Site with the exception of the specific "carve-out" for Future Costs claims. Again, Asarco's contribution claim brought in this action clearly arises out of and is connected to the CDA Site and, therefore, was released under the terms of the Bankruptcy Settlement. Further, Asarco's argument that it did not have or know whether it had a contribution claim at the time of these settlement negotiations does not change this interpretation.[18] The terms expressly contemplate all claims "whether known or unknown" which is allowed under Texas law particularly where, as here, sophisticated parties negotiated the terms of the agreement. *Sanus*, *supra* and *Keck*, *supra*.

---

[18] The Court is not persuaded by Asarco's argument that Ms. Larson only had authority to settle the claims in the POC given the comprehensive and global nature of these settlement discussions and the Asarco bankruptcy proceedings overall.

While the contract, with all due respect, is not a model of clarity, the testimony and evidence at trial support this conclusion as being the most reasonable interpretation of the Bankruptcy Settlement and the intent of the parties at the time of their negotiations.

Robert Jones, Union Pacific's bankruptcy attorney at the negotiations, testified that in the parties' communications leading up to and during the negotiations of the settlement agreement, Union Pacific made its intention clear that any resolution needed to be global, universal, and resolve the issues between the parties whether known or unknown. (TT 1984:7-14, 1987:6-1989:10, 2006:24-2007:20, 2008:23-25, 2025-2027.) Union Pacific's position during the negotiations was that it was prepared to settle its claims provided that it received mutual releases that would "comprehensively" or "globally" resolve all of the issues between Union Pacific and Asarco. (TT 2030-2031.) Because Union Pacific believed it "very clearly" conveyed that condition and intention up front, Mr. Jones testified, Union Pacific interpreted the first proposed settlement document drafted by Ms. Larson which contained "a very comprehensive, customary, broad general release" in the Mutual Release section of the agreement as being consistent with Union Pacific's expectation and understanding that the intent of both parties was to pursue a global settlement of all issues between them. (TT 1987:6-1989:10, 2025:5-17, 2026-2027.) The Mutual Releases section in particular, Mr. Jones testified, was interpreted by Union Pacific to mean that Asarco was releasing all claims of any character arising out of or in any way connected with the Remaining Sites Costs, including the CDA Site. (TT 2021:13-17.) Interpreting the contract from that perspective, Union Pacific understood the contract's terms to mean the parties were settling all of the claims in Union Pacific's POCs and any

claims that Union Pacific could have brought with respect to those claims at the CDA Site and, in exchange, Asarco agreed to settle/release its claims against Union Pacific that were "connected with" the POCs claims or expenses relating to the CDA Site which includes this contribution action. (TT 1975:6-12, 2021:13-17, 2025, 2032-2034.)

The witnesses who represented Asarco at the negotiations, however, testified that they believed the settlement was only as to Union Pacific's bankruptcy claims. (TT 1905-1906, 1922-1924, 2050:4-5, 2114, 2118, 2089-2092.) Asarco's CERCLA Counsel during the negotiations, Linda Larson, testified that her understanding of the parties' agreement was that they were settling all of the claims in Union Pacific's POCs for a liquidated amount so both sides could avoid an estimation hearing and Union Pacific would be able to get in line as an unsecured creditor in Asarco's bankruptcy. (TT 2089-2090, 2146.) Further, Thomas Aldrich, the Debtor's representative at the negotiations, testified that the Debtor-Asarco's intention from the start of the bankruptcy negotiations was to reserve its right to seek contribution from other PRPs, such as Union Pacific, going forward because Asarco believed the claims from the Government were strict and several liability and that Asarco would be faced with 100% of the cleanup costs making it very important to retain the right to go after contribution from other PRPs. (TT 2055-2056.) Mr. Pfahl likewise testified that Asarco did not intend to waive or release any claim it had against Union Pacific for contribution related to the CDA Basin in the Bankruptcy Settlement Agreement. (TT 1928.)

The Court finds Union Pacific's interpretation of the contract is the most reasonable in this case given the communications between the parties and circumstances at the time.

Asarco had filed for Chapter 11 bankruptcy seeking to reorganized and resolve its liabilities nationwide. (Ex. 8.) Union Pacific was one of many creditors who filed POCs. Union Pacific's agreement in this settlement to compromise its $52 million dollar claim for the CDA site for only $1.8 million was in exchange for Asarco's agreement to mutually release its claims against Union Pacific. Asarco's argument that the mutual release only required that it not later contest the amounts of the claims provides no benefit or value to Union Pacific in exchange for the $52 million in claims Union Pacific compromised in the settlement. The Bankruptcy Court's approval of the settlement provided Union Pacific with a court order upon which it could enforce the settlement amounts; Union Pacific did not need Asarco's promise in order to do so. The reasonable interpretation of the contract, therefore, is that Asarco agreed to release something more than merely its promise to not contest the agreed upon amounts; otherwise, the releases were anything but mutual. As discussed above, Asarco agreed to release "any and all claims" whether known or unknown, relating to the CDA Site.

The Court also finds Asarco's position ignores the purpose and context of the bankruptcy proceedings. Asarco filed a Chapter 11 voluntary petition for relief seeking corporate reorganization. "Chapter 11 strikes a balance between a debtor's interest in reorganizing and restructuring its debts and the creditors' interest in maximizing the value of the bankruptcy estate." *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 51 (2008). This balance furthers "Chapter 11's twin objectives of preserving going concerns and maximizing property available to satisfy creditors." *Id.* (citations and marks omitted).

Here, Asarco was in the midst of a contentious bankruptcy proceeding with both the Debtor-Asarco and the Parent-Asarco submitting plans for reorganization. Therefore, it was advantageous to both Union Pacific and Asarco to globally and comprehensively settle their claims and avoid an estimation hearing, provide Union Pacific with an unsecured claim, and clear the way for confirmation of a plan of reorganization for Asarco. (Ex. 8 at 6.)

Both sides also presented testimony and evidence concerning the drafting and wordsmithing of the Bankruptcy Settlement. Generally, where a document is found to be ambiguous, the writing is "construed strictly against the author and in a manner so as to reach a reasonable result that is consistent with the intent of the parties." *AT&T Corp. v. Rylander*, 2 S.W.3d 546, 559 (Tex. App. 1999) (citing cases). This rule of construction against the drafter, however, should be a last resort used only as "merely a tiebreaker when a contract is susceptible to two equally reasonable interpretations." *Weber v. PACT XPP Tech., AG*, 811 F.3d 758, 770 (5th Cir. 2016); *see also Hunt Building Co., Ltd. v. John Hancock Life Ins. Co. (USA)*, EP-11-CV-00295-DCG, 2013 WL 12094199, at *4 (W.D. Tex. Aug. 12, 2013) (construing the ambiguities in a contract against the drafter applies when the extrinsic evidence fails to yield a conclusive answer to the parties intent). "Construing the contractual language against the original drafter is particularly inappropriate when the agreement resulted from a volley of negotiations between two equally footed parties." *W.F. Barnes v. Forest Hills Inv., Inc.*, 11 F.Supp.2d 699, 707 (E.D. Texas 1998). The Court finds this rule of contract interpretation does not apply in this case

where the parties on both sides were sophisticated and both had retained experienced teams of attorneys to represent them in the negotiations. *See Id.*

To the extent the parties' exchanges over wording and phrases is relevant as extrinsic evidence of the parties intent, the Court's ruling remains the same.

Asarco's CERCLA counsel, Ms. Larson, drafted the initial Bankruptcy Settlement document offered to Union Pacific using a template. (TT 2111, 2118-2119, 2123-2126.) Union Pacific's bankruptcy attorney, Mr. Jones, testified that Union Pacific viewed the initial draft as a good starting point for negotiations because Union Pacific believed it had made "very clear" that a condition of the settlement was to secure a global/comprehensive resolution of all issues between it and Asarco and because it viewed the mutual release language proposed to be "very comprehensive, customary, [and a] broad general release" consistent with Union Pacific's understanding of the intent of the parties. (TT 1987:6-1989:10, 2026-2027.) Mr. Jones' understanding is reasonable given Ms. Larson's letter accompanying Asarco's initial settlement offer states: "Asarco is prepared to resolve all claims, between it and [Union Pacific] for a general unsecured claim in the total amount of $4,101,078." (Ex. 48.)

The parties' use of inclusive, rather than exclusionary, terms such as global, mutual, and comprehensive during their negotiations is an acknowledgement of their intent that the settlement encompassed all of the claims between them. The language of the settlement agreement reflects that intention referring to "any and all claims."

As part of the negotiations, Union Pacific suggested adding the Future Costs carve-out and the date for Past Response Costs. Most notably, at the last minute, Union Pacific

asked that the words "including but not limited to" be deleted from the Mutual Releases section. Those changes, however, did not alter either parties' understanding or interpretation of the terms of the Bankruptcy Settlement at the time. Neither side testified that taking out the phrase "including but not limited to" materially altered their understanding of the Mutual Releases section of the document. Instead, both sides agreed to the change and believed it made the whole paragraph consistent with the final sentence regarding future costs. (TT 1982:17-1983:22, 2117-2119.) Moreover, both parties' arguments and positions as to each of their intentions and understandings of the agreement rely on language in the settlement agreement and evidence other than the deleted phrase to support their respective interpretations.

Asarco argues the "Whereas clauses" in the Recitals' section of the contract limit the settlement's scope to resolving only Union Pacific's POCs. (Dkt. 335 at 39-45.) While those clauses may appear to create an ambiguity when read on their own, the Court finds the terms of the settlement document when read as a whole, in the context of the totality of the circumstances at the time, and in light of the communications between the parties during their negotiation all show that the parties' intended for the Mutual Releases to apply to more than just Union Pacific's POCs. Specifically, the parties mutually released any and all claims, whether known or unknown, arising out of or in any way connected with the Remaining Sites Costs which includes the CDA Site. Moreover, the parties knew how to exclude any claims they wanted to reserve from their broad, inclusive settlement. Union Pacific did so by carving out the Future Costs Claims and both parties reserved their right to bring any claims they may have against persons or entities other than Asarco and Union

Pacific. (Ex. 67.) There is no such reservation for Asarco's contribution claim against Union Pacific in the settlement agreement.[19] Nor did the Debtor-Asarco, the Asarco-entity negotiating the Bankruptcy Settlement, seek to preserve any contribution claim against Union Pacific in its proposed plan of reorganization. (Ex. 76.)

For these reasons, the Court concludes that Asarco released its contribution claim in the Bankruptcy Settlement.

## CONCLUSION

Based on the evidence presented at trial, the Court finds Asarco has failed to prove by a preponderance of the evidence that it paid more than its proportionate share of its liability at the CDA Site. Therefore, Asarco has no right to bring this contribution claim under § 113(f) of CERCLA. Further, the Court finds Union Pacific has shown Asarco released its right to bring a contribution claim against it in the Bankruptcy Settlement. For these reasons, the Court finds in favor of Union Pacific in this matter and will enter a judgment consistent with this decision.

**IT IS SO ORDERED**.

DATED: July 26, 2018

_Edward J. Lodge_

Honorable Edward J. Lodge
U.S. District Judge

---

[19] The parties' witnesses disagreed over who should have addressed the possibility of Asarco's future contribution claim. The testimony from both sides was that they each believed the onus was on the other to have considered, raised, preserved, and/or released the possible contribution claim with neither side prevailing on that point. Regardless, the fact remains that the claim was not preserved and, therefore, was waived by the broad, inclusive language of the Mutual Releases.